## G. M. FOGG v. THE UNION BANK.

1. DURESS. Nothing short of duress in its legal sense can invalidate an executed contract, and by this is meant that degree of severity, either threatened and impending, or actually inflicted, which is sufficient to overcome the free agency of a person of ordinary firmness.

  Cases cited: McSween v. Miller, MSS. Knoxville, September Term, 1867; Hiller v. Wood, MSS. Nashville, December Term, 1870; Rollings v. Cate, 1 Heisk., 102.

  Authorities cited: 2 Greenleaf on Ev., 283; Brown v. Pierce, 7 Wall., 214.

2. SAME. Case in judgment. A cross-bill seeking to avoid a payment in Confederate notes made by the branch of the Union Bank at Memphis to one of its depositors in 1862, alleged an intense state of excitement as existing at the time over a rumored military order requiring all persons to receive Confederate money, which order was being enforced by a vigilance committee; that the terror and apprehension thus engendered was known to the depositor, and was at its height when he was notified by the bank to withdraw his deposits, and to receive them

in Confederate notes, which for the time he declined to do, but that after a fruitless negotiation of several days, the bank, being very persistent, and fearing the results of a positive refusal, he withdrew his deposits, receiving the greater portion of them in Confederate notes. It is not alleged that the depositor was enfeebled by anything except age, he being then sixty-five years old, or that he was not a person of ordinary nerve, or that any such order in fact existed, or was brought to his notice, or that he knew of or was in any way interfered with by the committee, or that he was influenced by the alleged reign of terror, or that the bank threatened him with the military, or that he was in any way compelled to withdraw his deposits.

*Held*, That the facts relied on did not constitute duress, and that the cross-bill was demurrable.

FROM DAVIDSON.

No record can be found.

NICHOLSON, C. J., delivered the opinion of the Court.

The original bill was filed on the 31st of July, 1865, for the purpose of having the business of the Union Bank settled and closed up in the Chancery Court at Nashville.

The cross-bill was filed on the 26th of June, 1869, by the executor and executrix of Wm. H. Long, deceased, for the purpose of setting aside a settlement made by Wm. H. Long with the branch bank at Memphis, on the 28th of March, 1862, upon the allegation that the settlement was procured by duress, coercion, and undue influence. The Union Bank demurred to the cross-bill, upon the ground that no such duress, coercion, and undue influence were alleged as could authorize the Court to set aside the settlement.

The demurrer having been overruled, the bank has appealed.

The controlling question in the case is, whether the facts alleged in the bill constitute such duress, or coercion, or undue influence as entitled complainants in the cross-bill to have the contract of settlement, which they admit was made on the 28th of March, 1862, set aside?

The facts alleged in the bill, on which the question arises, are as follows:

Wm. H. Long, the testator, died on the 4th of May, 1867, in Madison County, Tennessee, where he had long lived, aged about seventy years; that for many years before his death he was much enfeebled in body and troubled in mind, in consequence of the effects of old age, and the late civil troubles; that he had been for many years a depositor in the branch of the bank at Memphis, and that on the 28th of March, 1862, he had on deposit $31,656 34, and that a settlement appears on the books of the bank of that date showing a withdrawal of his deposit, but which settlement their testator made under duress, coercion, and undue influence, as will appear fully in the further statements and allegations of their cross-bill.

After referring historically to the policy of the Confederate government in resorting to the issuance of treasury notes as a means of prosecuting the late war, and in forcing the currency into circulation, if necessary, by military force, complainants allege that in consequence of this settled policy, and the active co-opera-

tion of the military, a popular clamor and intense excitement were gotten up before the close of 1861 against all persons who refused to take the Confederate money, and that this feeling was particularly intense and bitter in the western part of the State, and that it was reported and believed in all business circles, that Gen. Beauregard, then commanding a department including West Tennessee, issued, some time about the last of 1861, a military order requiring everybody in his department to take Confederate money, under threats of heavy penalties of fine and imprisonment, for a refusal; and that soon after the reported issuance of this order, several persons were arrested and carried to Jackson, in Madison County, Tennessee, and some of them imprisoned for refusing to take the money; and that the Courts of the County had in the meantime been suspended, and by a military order of March 10, 1862, L. D. McKissack was appointed Provost Marshal and Civil Governor of the city of Memphis, and so continued until some time after the battle of Shiloh, in April, 1862, and that during this period the vigilance committee, at Memphis, were actively engaged in hunting down and bringing to punishment all persons who discredited or refused to take Confederate money, and that the terror and apprehension thus engendered in the public mind was well known to their testator when he was required to go to Memphis and withdraw his deposit.

Complainants allege that somewhere about the 20th of March, 1862, when the excitement about Confederate

money was nearly or quite at its highest point, their testator received a notice from the said branch bank to come to Memphis and withdraw his deposit; that he was very much disinclined to go, because he had the charge of his three daughters, and no male member of his family at home, but upon the advice of friends, that it would be safest and best, he went.

Complainants allege that on his arrival at the bank he was required to withdraw his deposit at once, and to receive it all in Confederate money, which, for the time he declined, and attempted to waive or delay the matter; that the bank persistently demanded the withdrawal of the deposit in that description of money, and that their testator protested against taking it, but demanded payment in the notes of said bank, and this was kept up several days; that their testator, seeing no way to waive or longer delay the matter, and fearing the results of a positive refusal, did, still under protest, on the 28th of March, 1862, withdraw his deposit from said branch; that having in the meantime induced said bank, on his repeated assurances that Confederate money would be wholly worthless to him, to let him have some small amount in other money, he received from said bank $3,656 34 in the notes of Southern banks, and the balance, $28,000, in worthless Confederate notes; that he left said Confederate money in Memphis, with an officer in the Bank of West Tennessee, who has recently informed complainants that he carried the money South, and invested part of it in Confederate bonds, and had the balance in packages

just as he received them, which bonds and packages will be filed with the papers in this cause.

Complainants alleged that soon after the close of the war their testator engaged an attorney to file a bill, or take necessary steps to collect the amount due him from the bank, but said attorney died before instituting proceedings, and that he spoke to two others to undertake his case, and they agreed to do so, but for various causes intervening, they did not get ready to begin suit in the life-time of testator.

Assuming the allegations of the bill to be true, so far as they state facts, the question is, do they show that the testator made the settlement and withdrew his deposit from the bank on the 28th of March, 1862, in consequence of duress, coercion, or undue influence?

In 2 Greenleaf on Ev., 283, it is laid down that "by duress, in its more extended sense, is meant that degree of severity, either threatened and impending, or actually inflicted, which is sufficient to overcome the mind and will of a person of ordinary firmness." This definition of duress was adopted in the case of *Brown* v. *Pierce*, 7 Wall., 214.

In the case of *McSween* v. *Miller*, decided at Knoxville, at September Term, 1867, Judge Hawkins said: "The controlling question is, was the threat of such a character as, under the circumstances surrounding the parties at the time, was sufficient to overcome the mind and will, or, in other words, to destroy the free agency of a person of ordinary firmness."

In the unreported case of *Hiller* v. *Wood*, decided

at Nashville, December Term, 1870, this Court said: "To make the defence of duress effective, there must be something more than a mere possibility that there may be danger of arrest. The apprehension of danger must be based upon threats, or other evidences of impending danger, calculated to awaken the real fears of a man of ordinary nerve."

And in *Rollings* v. *Cate*, 1 Heisk., 102, this Court said: "To hold that every citizen who passed or received Confederate treasury notes, under some general or indefinite apprehension that his failure to recognize the currency would give offence to the government, or any of its officers, acted under duress, and that his action can now be repudiated and disowned would open the flood-gates of litigation, and unsettle all dealings and transactions in this State in which the currency was employed. Nothing short of duress in its legal sense can invalidate executed contracts."

The question whether the testator of complainants made the settlement and withdrew his deposit under duress or coercion, must be determined by applying the facts to the rules laid down in the authorities referred to. The controlling question is, did the testator make the settlement and receive the deposit under such apprehension of impending danger, in view of all the surrounding circumstances, as deprived him of his free agency? In determining this question, it is proper to look to the age and condition of the testator, as well as to his personal character, so far as the same is in proof. He died in 1867, at the age of seventy, he

was consequently sixty-five years of age in 1862. It is not shown that he was then enfeebled by anything else than age, nor is it shown that he was not a man of ordinary firmness. We are to assume that there was intense excitement in the public mind, in consequence of the rumored issuance of a military order requiring all persons to receive Confederate money, but it is not alleged that any such order had, in fact, been issued; nor is it alleged that the testator had such information or belief. It is alleged that there was a Vigilance Committee at Memphis, enforcing the order as to Confederate money, but it is not alleged that testator knew of such committee, or that he was in any way interfered with by that committee. We are left to assume or to conjecture that the testator acted with a knowledge and under the influence of these causes of excitement in the public mind.

It does not appear, after testator reached Memphis, that he was in any way influenced or controlled by the alleged terror there prevailing—no such allegation is made. It appears that when he called for his deposit the bank was ready to pay in Confederate money, but testator refused to receive it; yet it is not alleged that the bank made any threat of resorting to the military, or even alluded to the fact that there was any military order on the subject. Testator refused to receive the Confederate money, and the bank declined to pay in any other money. Testator left and returned, and renewed the negotiation for eight days, and finally received $28,000 in Confederate notes, and $3,656 in

Southern notes.  But it is not alleged that during this eight days of negotiations, during which testator was refusing to receive Confederate money, any officer of the bank ever intimated to him that by so refusing he was endangering his personal liberty, or that any member of the Vigilance Committee ever interfered to subject him to punishment for his refusal.  Nor is it alleged that testator was in any way compelled to withdraw his deposit.  He manifestly had his election to receive his deposit in Confederate notes or to let it remain and take the risks.  He exercised his election to let it remain for eight days, and being unable to make any better contract with the bank, he took $3,656 in Southern notes and the remainder in Confederate notes.

We can see in the transaction no evidence that testator acted under sense of impending danger, produced either by threats of the bank, or fears that he would incur the penalties of any military orders.

Applying the rules of law already cited to the facts of the case, and giving full force to the fact that testator was an old man of sixty-five years, and that there was a general public excitement on the subject of Confederate money, we are unable to see in the transaction any ground on which to hold that there was duress, coercion, or undue influence on the part of the bank.  We are, therefore, of opinion that the Chancellor erred in overruling the demurrer, but the same ought to have been sustained and the bill dismissed which is now done.