**In re Charles M. McNEIL, Debtor.**

**UNITED STATES FIDELITY & GUARANTY COMPANY, Plaintiff,**

**v.**

**CASSEL BROTHERS, INC., Charles M. McNeil, et al., Defendants.**

Bankruptcy No. 3–80–01159.
Adv. No. 3–81–0046.

United States Bankruptcy Court,
E. D. Tennessee.

Aug. 11, 1982.

W. Carr Hagan, Jr., Kingsport, Tenn., for plaintiff.

John S. McLellan, Kingsport, Tenn., for defendants-counterclaimants.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

This Memorandum involves a determination of whether any liability for damages, in favor of the counterclaimants, Cassel Brothers, Inc., and Charles M. McNeil, and against plaintiff United States Fidelity and Guaranty Company (USF&G), exists as a result of events connected with the cessation of business by Cassel Brothers, Inc. (Cassel Bros.). A complaint requesting the appointment of a receiver, injunctive relief, exoneration, and indemnification was filed on behalf of USF&G on March 11, 1980, in Sullivan County Chancery Court. The defendants named therein were Cassel Bros., Charles M. McNeil, and numerous parties with interests of record against the real property owned by either Cassel Bros. or McNeil, who is the principal and sole shareholder of Cassel Bros. In their answer and counterclaim, McNeil and Cassel Bros. requested dismissal of the complaint of USF&G and alleged that USF&G was liable to them for wrongfully undertaking to complete construction projects of Cassel Bros. for which USF&G had issued performance bonds.

USF&G filed an involuntary petition in bankruptcy against Charles M. McNeil on September 8, 1980, pursuant to the provisions of 11 U.S.C. § 303(b). Although McNeil opposed that petition, an order for relief under Chapter 7 was entered following a trial. 11 U.S.C. § 303(h)(1). Thereafter, on January 15, 1981, an application for removal of the USF&G action in the Sullivan County Chancery Court to this court was filed by USF&G based on 28 U.S.C. § 1478(a).

### I

Cassel Bros. commenced doing business in 1937 as a partnership, but the business was incorporated in 1958 as a Tennessee corporation. Cassel Bros. was a general contractor engaged in the construction of commercial, industrial, public, and residential buildings in Kingsport, Tennessee, and the surrounding area until January of 1980. Two of the larger projects completed by Cassel Bros. are Kingsport's Dobyns-Bennett High School and Freedom Hall in Johnson City. A performance bond was required for numerous projects undertaken by Cassel Bros. There has been a long-standing principal-surety relationship between Cassel Bros. and USF&G.

Charles M. McNeil has been continuously associated with Cassel Bros. since 1965. McNeil became the only stockholder of the company in 1970. He was president of Cassel Bros. during the entire period involved herein. On August 1, 1973, McNeil, acting in his individual and official capacity, executed a Master Surety Agreement in favor of USF&G (Exhibit 2). By virtue of this

agreement, Cassel Bros. and McNeil agreed to indemnify USF&G, which acted as surety for Cassel Bros. construction projects, for any expenses or losses incurred by USF&G as a result of performance bonds provided on behalf of Cassel Bros.[1]

On August 28, 1978, two separate contracts were executed by Cassel Bros. in connection with proposed projects on which Cassel Bros. had been the successful bidder. The first contract involved a rental housing project in St. Paul, Virginia, on which Cassel Bros. submitted a bid of $2,621,000.00 to the Wise County Redevelopment and Housing Authority. The subject of the second contract was a proposed nine-story structure to be built in Norton, Virginia, for a contract price of $4,165,000.00. This structure was to be built for the Norton Redevelopment & Housing Authority to provide satisfactory housing for elderly citizens. Each of these projects was to be funded by the Department of Housing and Urban Development (HUD). USF&G issued performance bonds on each project on behalf of Cassel Bros.

Construction commenced on the two projects during September of 1978. To some extent, adverse weather and excavation problems hampered progress on each project. Construction of the Norton project was further hindered by the malfunction of equipment, delays in the receipt of steel, delays attributable to the architect for the project, and a dispute about the proctor factor.[2] A letter dated August 30, 1979 (Exhibit 44), from James L. Bolling, Executive Director for Norton Redevelopment & Housing Authority, expressing concern over the lack of progress on the Norton project was submitted to USF&G.[3]

The testimony reflects that disputes about the progress payments existed between Cassel Bros. and the respective project owners. In each case, the respective housing authority was not permitted to make progress payments in an amount in excess of the amount authorized by the HUD inspector. McNeil testified that the project owners seldom made progress payments on time and that they also failed to pay substantial sums to which Cassel Bros. was entitled, with the result that the cash flow of Cassel Bros. was adversely affected. (Tr. p. 52).

The architect for the Norton project notified McNeil by letter dated November 29, 1979 (Exhibit 29), that construction above the level of the second floor should cease until a determination could be made whether or not certain steel bands or stirrups[4] were installed in the columns at the juncture of the second floor when the columns and floor slab were poured. It was ultimately determined that the stirrups had in fact been omitted by a subcontractor. However, the parties failed to resolve the problem and no further construction work was performed by Cassel Bros. on the Norton project. It was, and continues to be, the contention of Cassel Bros. that it was impossible to install the stirrups as designed.[5]

The difficulties experienced by Cassel Bros. in the construction of the St. Paul project were minor in comparison with the problems associated with the Norton project. For example, Charles McConnell,

---

1. Cassel Bros. obtained performance bonds from USF&G through the Ben Edwards Insurance Agency of Kingsport for a number of years prior to 1976 according to McNeil's testimony (Tr. pp. 9, 12). Cassel Bros. changed bonding representatives and began to do business with Crump Associates, which also represented USF&G. No new Master Surety Agreement was executed when Cassel Bros. switched bonding representatives since each agency represented USF&G.

2. The proctor factor is a measure of the moisture content of the fill dirt.

3. The scheduled progress, including an allowance for bad weather, was 43.5% but the actual progress was purportedly approximately 9%.

4. The purpose of these stirrups was to reinforce the columns by providing increased resistance to torque during an earthquake.

5. The stirrups in question were ultimately installed in accordance with a modified plan proposed by Cassel Bros. which was initially rejected by the Norton Housing Authority.

Executive Director of the Wise County Redevelopment and Housing Authority, notified USF&G of a mechanic's lien[6] against the St. Paul project, by a letter of December 31, 1979 (Exhibit 43). McConnell advised USF&G that he had previously informed Cassel Bros. of the existence of the mechanic's lien.

On or before January 9, 1980, McNeil contacted Tom McCarley, a bonding agent for Crump Associates, to discuss the problems of Cassel Bros., particularly those associated with the Norton project. Thereafter, acting on McCarley's advice, McNeil submitted the following letter dated January 9, 1980, to USF&G:

As you know we are presently experiencing some serious cash flow problems. Due to problems encountered on the housing project in Norton and to other problems we are at present unable to continue in business without some financial assistance.

We have already exhausted all of our regular sources for additional monies and we are therefore requesting that USF&G provide us with such financial assistance as is necessary to permit us to continue in business.

We believe that with this assistance we can continue in business and eventually overcome the problems with which we are now faced. (Exhibit 25)

An income statement of Cassel Bros. for the 1979 calendar year was submitted to USF&G with a letter dated January 10, 1980 (Exhibit 32). This statement reflected a net loss of $482,074.94.

A meeting attended by McNeil and Thomas J. Luster, of Cassel Bros., Donald J. Beasley and Ed Kirsch of USF&G, and several representatives[7] of Surety Service Associates, an Atlanta consulting firm, was commenced on January 15, 1980, in Kingsport. The books of Cassel Bros. were reviewed[8] and the Norton and St. Paul job sites were visited by some of the representatives of the consulting firm and Thomas J. Luster, Vice-President of Cassel Bros.

On January 17, 1980, Ed Kirsch advised McNeil (Tr. p. 408) that USF&G would not provide financing for the continued operation of Cassel Bros. Kirsch prepared a letter of default which McNeil refused to sign. The letter was revised to exclude the word "default." The text of the revised letter (Exhibit 21), which was in fact signed by McNeil according to his own testimony, dated January 17, 1980, and addressed to Don Beasley of USF&G reads in apposite part as follows:

Cassel Bros., Inc., is unable to complete the contracts secured by USF&G bonds due to the financial condition of the company. This is to call upon USF&G to complete these construction contracts in whatever method it deems best and to this end we are relinquishing control of these contracts to the surety.

McNeil advised Kirsch prior to executing the January 17, 1980, letter that he wanted to review the letter with his attorney. Kirsch encouraged him to do so. McNeil did not, in fact, take the letter to his attorney to review the letter. However, the letter was not actually signed until a few hours after it was drafted. In his counterclaim, McNeil alleged that this letter was signed under duress and that it is voidable and of no legal effect.

According to USF&G, the decision not to finance Cassel Bros. was based on the following factors:

(1) Cassel Bros. lacked the capacity to perform the contracts for which

---

6. The mechanic's lien in the amount of approximately $28,000.00 was in favor of P. R. International, Inc., of Greensboro, N. C.

7. Some of these representatives are principals in the construction companies which completed some of the uncompleted projects of Cassel Bros. McNeil alleged that the identity of these parties was concealed by USF&G, but the record does not reflect that USF&G was aware of the fact that some of the parties associated with Surety Service Associates were prospective contractors for the completion of Cassel Bros. projects. (Tr. pp. 397, 417).

8. The terms of the Master Surety Agreement afford access to the books and records of Cassel Bros. to USF&G.

USF&G had issued performance bonds.

(2) A long term financing arrangement would have been involved since the Norton project was only 20% completed and some other bonded projects had not ever been commenced.

(3) A capital infusion of approximately $1,000,000.00 would have been required to pay outstanding obligations and complete the contracts.

(4) Cassel Bros. would still have been insolvent. The projected loss on the Norton project according to the figures submitted by the project manager for Cassel Bros. exceeded $1,300,000.00 [9] (Exhibit 58).

A letter dated January 18, 1980 (Exhibit 33), declaring Cassel Bros. in default was submitted to USF&G by an attorney on behalf of the Wise County Redevelopment and Housing Authority. It was noted in this default letter that Cassel Bros. was in "bad financial condition," that subcontractors and suppliers for the St. Paul project were unpaid, and that Cassel Bros. could not perform its contractual obligations. A request was made that USF&G immediately pay the claims of unpaid laborers, suppliers, and subcontractors.

Surety Service Associates undertook to prepare a bid package on the completion of the Norton project at the request of USF&G. The package was circulated to contractors but there were only two bids submitted to complete the Norton project. Each of these bids was disqualified.[10] Ultimately, a negotiated bid from Stratton & Company [11] in the amount of $5,057,000.00 was accepted. (Tr. p. 362). The liability of

USF&G on its performance bond in which the Norton Redevelopment & Housing Authority was the obligee was settled by the payment to Norton of $1,844,000.00.[12]

According to the testimony of Donald J. Beasley, Tennessee Superintendent of Claims for USF&G, the St. Paul project was completed in a different manner. USF&G actually contracted with the Wise County Redevelopment and Housing Authority for the completion of the St. Paul project. Thereafter, USF&G entered into a contract (Exhibit 55) with Jamison Company, Inc.,[13] for the completion of the project.

No action has been commenced by either Cassel Bros. or USF&G against either the architect for the Norton project who designed the problematic stirrups or the subcontractor which failed to install the stirrups. The stirrup problem was a mitigating factor in the negotiations between USF&G and the Norton Housing Authority on the question of the liability of USF&G on the performance bond. The subcontractor which poured the cement without installing the stirrups is reportedly judgment-proof. McNeil has likewise not pursued any action against either the architect for the Norton project or the housing authorities which purportedly failed to make progress payments in amounts to which Cassel Bros. was entitled. (The counter-claimants have insisted that it was impossible to install the stirrups on the Norton project in conformity with the architect's design.)

An Order Granting Motion for Partial Summary Judgment was previously entered in favor of the plaintiff USF&G on November 12, 1980. Under the terms of that

---

**9.** The project manager for Cassel Bros., David Edwards, had recommended a shutdown of the Norton project to eliminate the expense of the crane rental. (Tr. p. 249).

**10.** The bid of Foster & Cooper was rejected because the contractor was not licensed in the State of Virginia, whereas the bid of Stratton & Company was rejected because it was not accompanied by a bid bond.

**11.** T. A. Stratton, of Stratton & Company, was one of the individuals whom Surety Service Associates sent to Kingsport from Atlanta on

January 15, 1980, to assess the situation of the uncompleted projects of Cassel Bros.

**12.** This sum is included in the amount of the partial summary judgment in favor of USF&G entered by this court on November 12, 1981, against McNeil.

**13.** E. K. Jamison was one of the consultants brought to Kingsport by Surety Service Associates on January 15, 1980, to assess the situation of Cassel Bros.

order, USF&G has a liquidated claim against Charles M. McNeil in the amount of $3,296,527.57,[14] as of November 4, 1980. Additionally, as of November 4, 1980, McNeil was indebted to USF&G for bond premiums in the amount of $26,997.00.

## II

The only matter involved herein is the counterclaim of Cassel Bros. and Charles M. McNeil against USF&G. It is the allegation of the counterclaimants that USF&G wrongfully assumed responsibility for the completion of Cassel Bros. construction projects on which USF&G had issued performance bonds and that the counterclaimants are entitled to compensatory and punitive damages. The counterclaimants have also alleged that USF&G publicized its assumption of the Cassel Bros. projects in the media, consequently preventing Cassel Bros. from obtaining performance bonds from any other bonding agency. The counterclaimants assert that the actions of USF&G were "malicious, deceitful, wanton, and in total disregard" of the rights of Cassel Bros. and McNeil. (Defenses And Counterclaim Of Defendants And Plaintiffs By Counterclaim, Cassel Bros., Inc., And Charles M. McNeil at 11)

The counterclaimants request that the court find that the January 17, 1980, letter from McNeil to USF&G, wherein it was requested that USF&G complete the construction contracts of Cassel Bros. "in whatever method it deems best," was submitted under duress and that the letter is voidable. The court is also asked to find that the counterclaimants were not in violation of the terms of the Master Surety Agreement on January 17, 1980.[15]

## III

■ It is the theory of the counterclaimants that a fiduciary relationship existed between Cassel Bros. and USF&G and that there was an affirmative duty upon USF&G to disclose all material facts solely within its possession. Alternatively, the counterclaimants argue that at a minimum there was a duty on the part of USF&G to exercise good faith in its dealings with Cassel Bros. and McNeil.

The relationship between the counterclaimants and USF&G is that of principal and surety. There is no reported Tennessee decision on the issue of whether a fiduciary relationship exists between a principal and a compensated surety. A fiduciary relation "exists where there is special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to interests of one reposing the confidence." Black's Law Dictionary 753–54 (4th ed. 1951). A surety is defined as "one who undertakes to pay money or to do any other act in event that his principal fails therein." Black's Law Dictionary 1611 (4th ed. 1951).

This court does not believe that the counterclaimants reposed any special confidence or trust in USF&G analogous to that found in a classic fiducial relation. The counterclaimants paid USF&G premiums in consideration of the issuance of bonds which Cassel Bros. had to furnish to obtain contracts for sizable construction projects. This court is not prepared to hold that this relationship should be characterized as fiducial, particularly since the Supreme Court of Tennessee has stated that no fiduciary relationship generally exists between an insured and an insurer when the company is attempting to settle a claim directly with its insured. *MFA Mut. Ins. Co. v. Flint,* 574 S.W.2d 718, 720 (Tenn.1978). The existence of a fiduciary relationship is more probable in a case

---

**14.** It was stipulated at trial that Cassel Bros. and McNeil are entitled to a credit for salvage realized since November 4, 1980, in the amount of $58,852.61.

**15.** The counterclaimants initially requested that the court find that the Master Surety Agreement was inapplicable. However, the court has previously concluded that the Master

Surety Agreement was in effect and that McNeil was liable to USF&G thereunder, beginning on August 1, 1973, and continuing until November 12, 1981, subsequent to the occurrence of the events involved herein, when the court entered an Order Granting Motion for Partial Summary Judgment in favor of USF&G.

such as *Flint* than in the instant case. In any event, the record does not reveal any concealment on the part of USF&G of material facts of which USF&G had knowledge.

The counterclaimants have asserted that there was bad faith on the part of USF&G surrounding the decision of USF&G to assume responsibility for the completion of the unfinished Cassel Bros. projects. It is incumbent upon the counterclaimants to establish bad faith by a preponderance of the evidence since the Tennessee decisions place the burden of proof on the party having the affirmative of an issue. *Big Fork Mining Co. v. Tennessee Water, Inc.*, 620 S.W.2d 515, 520 (Tenn.App. 1981).

Section VI(B) of the Master Security Agreement (Exhibit 2) affords USF&G "the right, in its discretion, to take possession of ... the work under contract(s) secured by BOND(S) ... and at the expense of UNDERSIGNED,[16] to complete or cause completion of any such work, or relet ... such contract(s)" upon the occurrence of specified contingencies or "upon the happening of any event ... which, in its sole opinion may expose SURETY to loss, cost or expense." One of the specified contingencies is "any breach, delay or default in any contract secured by BOND(S)." According to McNeil's own testimony (Tr. p. 142), in December of 1979, Cassel Bros. owed approximately $550,000.00 on three projects bonded by USF&G. Cassel Bros. had failed to pay subcontractors and materialmen and USF&G was aware of the filing of at least one materialman's lien against the St. Paul project. Construction at the Norton project, which was substantially behind schedule, was virtually at a standstill due to the stirrup problem which precipitated the stop order of the architect (Exhibit 29).

Despite the foregoing, the counterclaimants adopt the tenuous position that Cassel Bros. was not in default on the projects bonded by USF&G as of January 17, 1980.

The court concludes that there was a reasonable basis for USF&G to believe, as of January 17, 1980, that Cassel Bros. had defaulted on projects for which USF&G had issued performance bonds.

It is the counterclaimants' position that the January 17, 1980, letter (Exhibit 21) calling upon USF&G to complete the Cassel Bros. projects "in whatever method it deems best" is voidable since it was executed by McNeil under duress. The counterclaimants assert that McNeil executed the letter because he was coerced by the alleged threat of USF&G to see that Cassel Bros. received default notices from HUD (Tr. pp. 87, 152). However, McNeil's testimony on this assertion is confusing and somewhat inconsistent (Tr. p. 436).

A contract or other instrument is voidable under Tennessee law on the basis of duress if the free agency of a person of ordinary firmness would have been overcome in the procurement of the execution of the document which the party asserting duress seeks to avoid. *Fogg v. Union Bank*, 63 Tenn. 530 (1874). The pressure of financial circumstances is insufficient to establish "business compulsion" which will allow a party to avoid a prior agreement when the other party to the agreement is not responsible for the straitened financial circumstances. *French v. Shoemaker*, 81 U.S. (14 Wall.) 314, 20 L.Ed. 852 (1872).

Applying these tests to the facts herein, the court finds that the January 17, 1980, letter whereby Cassel Bros. relinquished control of certain construction contracts is not voidable on the basis of duress. McNeil had time between the time the final letter was drafted and the time when he signed the letter to consider the matter. He testified that he told Kirsch that he wanted to talk with his lawyer prior to signing the letter but that he really only wanted to "buy some time to talk to my people, Mr. Luster and Mr. Edwards, and also a business associate, and tell them

---

16. The agreement is signed by Charles M. McNeil in his representative capacity for Cas-

sel Bros. and in his individual capacity.

what I was about to do." (Tr. p. 157). Kirsch testified that he encouraged McNeil to see his lawyer prior to signing the letter in question (Tr. p. 432).

■ USF&G was not obligated to provide financing so as to permit Cassel Bros. to complete the bonded construction jobs in progress. The evidence presented by the counterclaimants clearly does not preponderate in favor of a finding of bad faith on the part of USF&G in connection with the surety's decision to undertake responsibility for the completion of the bonded projects and not to finance the continued operation of Cassel Bros. This is particularly true considering the uncertainty surrounding future developments at the Norton construction site, the 1979 income statement of Cassel Bros. reflecting a loss in excess of $400,-000.00, and the fact that an investment by USF&G of approximately $1,000,000.00 would have been required to complete the contracts and satisfy the outstanding obligations on the bonded projects.

■ The counterclaimants suggested in their Trial Memorandum that they are entitled to recovery from USF&G on the theory of tortious misrepresentation. The six elements of the tort of misrepresentation are: (1) the representation of either an existing or a past fact which is not merely an opinion related to the future; (2) the representation must be false; (3) the representation must involve a material fact; (4) it must be established that a false representation was made (a) knowingly or (b) without belief in its truth or (c) recklessly; (5) the party requesting recovery must have reasonably relied upon the misrepresentation; (6) the party seeking relief must have suffered damage. *Edwards v. Travelers Insur. of Hartford, Conn.*, 563 F.2d 105 (6th Cir. 1977).

The innuendo is that there was some impropriety on the part of USF&G in connection with the evaluation of the situation of Cassel Bros. as of January 15, 1980, by Surety Service Associates, since two of the consultants, Jamison and Stratton, are associated with two different companies which respectively completed the St. Paul project

and the Norton project. However, the record reflects that Kirsch testified that he was unaware of the fact that one or more of the consultants from Surety Services Associates might complete the Cassel Bros. projects (Tr. p. 417). Kirsch further testified that he had no knowledge of any previous project bonded by USF&G which had been relet to any of the individuals associated with Surety Service Associates (Tr. p. 418). He stated, "The function that they [Surety Service Associates] had performed for USF&G before was assisting us in relating other contracts to other contractors, not related to them." (Tr. p. 417). This testimony is uncontradicted and there is no evidence in the record to establish that USF&G misrepresented the identity of any individual to McNeil or any other party associated with Cassel Bros.

[8] The counterclaimants also assert that USF&G acted in bad faith by failing to pursue claims *of the counterclaimants* against third parties for impossibility of performance and refusal to make progress payments. It is alleged that Cassel Bros. was discharged from performance of the Norton and St. Paul contracts due to the prior breach of the housing authorities which failed to make progress payments to which Cassel Bros. alleges it was entitled. The counterclaimants also insist that the Norton contract was a nullity since it was impossible to perform. (It is alleged that it was impossible to install the stirrups on the lower floors as designed by the architect.)

The evidence of the counterclaimants does not support their allegations of bad faith on the part of USF&G based on the surety's decision not to pursue any claim of the counterclaimants against the respective housing authorities, the architect for the Norton project, or Pete E. O'Dell & Sons, the subcontractor which poured the cement without having installed the troublesome stirrups. According to the record, the stirrup problem was a mitigating factor in determining the liability of USF&G on the Norton project (Tr. p. 422). No action was pursued against Pete E. O'Dell & Sons because USF&G believed that a judgment

against them would be valueless. Finally, it should be noted that USF&G and the counterclaimants had a mutual interest in both the completion of the unfinished project of Cassel Bros. bonded by USF&G and the offset against the expense of completion of said projects in an amount of any damages to which the counterclaimants were entitled.

■ There is no evidence whatsoever in the record to support the allegations of the counterclaimants that USF&G published its appropriation of the Cassel Bros. contracts in the media and that the publication was injurious to Cassel Bros. as it precluded Cassel Bros. from securing bonds from other bonding companies subsequent to January of 1980. Nor have counterclaimants cited any authority for the proposition that such a publication may be the basis for a cause of action, even if publication had been made.

### IV

In summary, the counterclaimants have failed to prove bad faith on the part of USF&G in this case. USF&G was entitled to assume responsibility for the completion of the Cassel Bros. projects on which it had issued performance bonds pursuant to the provisions of the Master Surety Agreement. Cassel Bros. had defaulted on one or more of the projects bonded by USF&G and the surety had reason to believe that it was exposed to loss or expense in connection with the performance bonds on the Cassel Bros. contract for the Norton and St. Paul projects. The January 17, 1980, letter relinquishing the Cassel Bros. contracts to USF&G is not voidable. There is no clear and cogent evidence which would entitle Cassel Bros. or McNeil to recovery from USF&G on a theory of tortious misrepresentation or any other tort theory.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.

Submit judgment.