892 F.2d 199
 Fed. Sec. L. Rep. P 94,847
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,
Plaintiff-Appellee,
v.
Chris M. TURTUR and Stephen P. Turtur, d/b/a C & S Joint
Venture, Defendants-Appellants.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,
Plaintiff-Appellee,
v.
Mario TURTUR, Jr., Defendant-Appellant.
 Nos. 1040, 1041, Dockets 88-9105, 88-9107.
 United States Court of Appeals,
Second Circuit.
 Argued April 20, 1989.
Decided Dec. 18, 1989.
 
 Neil Schwarzfeld, New York City (Gregory Bitterman, Schwarzfeld, Ganfer & Shore, New York City), for defendants-appellants.
 Richard F. Russell, New York City (Denis Collins, D'Amato & Lynch, New York City), for plaintiff-appellee.
 David A. Leipziger and Samuel H. Greenbaum, Cox, Castle & Nicholson, Los Angeles, Cal., submitted a brief in support of plaintiff-appellee, for amicus curiae Admiral Ins. Co.
 Before LUMBARD, ALTIMARI and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendants-appellants Mario Turtur, Jr. and his sons, Chris M. Turtur and Stephen P. Turtur d/b/a C & S Joint Ventures (the "Turturs"),[1] appeal from summary judgments entered in the United States District Court for the Southern District of New York, Louis L. Stanton, Judge, in favor of plaintiff-appellee National Union Fire Insurance Company ("National Union").
 
 
 2
 National Union brought this diversity action, governed by New York law,[2] to enforce certain indemnity agreements between National Union and the Turturs, or alternatively to enforce its rights as an asserted subrogee of certain promissory notes issued by the Turturs. On December 30, 1982, the Turturs invested as limited partners in a tax sheltered limited partnership, American National Associates 367 ("ANA"), formed to acquire and lease computer equipment. They made cash down payments for their interests, and issued a series of promissory notes payable March 15, 1983-1987 in the total amount of $457,600 (the "Notes") for the balance.
 
 
 3
 In connection with this investment, the Turturs each entered into an "Indemnification and Pledge Agreement" with National Union (the "Indemnification Agreements") whereby, to induce National Union to guarantee payment of the Notes to ANA, the Turturs undertook to indemnify National Union for any payments it might make on the Notes pursuant to its guarantee. National Union issued its guarantee of the Notes on March 24, 1983.
 
 
 4
 The Turturs thereafter defaulted on the Notes payable March 15, 1985, claiming to have learned that ANA was a fraudulent enterprise. National Union then paid these Notes, and sued the Turturs for reimbursement, both pursuant to the Indemnification Agreements and as an asserted subrogee of these Notes. The Turturs denied any liability; they also counterclaimed for a judgment declaring that any future payments on the Notes by National Union would be "at its own risk," and enjoining any such payments.
 
 
 5
 National Union moved for, and was granted, summary judgment. The district court held that material issues of fact existed concerning National Union's claim to be a subrogee of the Notes, but that National Union was entitled to reimbursement from the Turturs under the Indemnification Agreements as a matter of law. Final judgments were entered in favor of National Union after National Union's motions for summary judgment against the Turturs were granted, and the Turturs' motion for reargument was denied.
 
 
 6
 On appeal, the Turturs contend that the district court erred in granting summary judgment because material issues of fact exist concerning their claims that (1) the Indemnification Agreements are unenforceable because they are part of overall contracts procured by fraud, and (2) National Union rendered substantial and knowing assistance to a fraudulent scheme for the promotion of ANA, thereby aiding and abetting a violation of federal securities law. Agreeing with the Turturs' first, but not second, contention, and concluding that the district court properly denied summary judgment to National Union as claimed subrogee of the Notes, we reverse the summary judgments entered in behalf of National Union and remand.
 
 Background
 
 7
 The "Financial Guarantee Bond for Limited Partnerships" (the "Guarantee") issued by National Union on March 24, 1983 guaranteed principal payments both on the Notes and on other note obligations of purchasers of limited partnership interests in ANA in a total amount of $1,086,800. The premium for the Guarantee, paid from the moneys provided to ANA by the limited partners, was $53,744.92. The Guarantee designated LaSalle National Bank (the "Bank") as a "permitted assignee." ANA assigned the Notes to the Bank to effect an immediate realization of the Note proceeds. Accordingly, after default by the Turturs, National Union paid the Notes due March 15, 1985 to the Bank, and subsequent Notes are also payable to the Bank.
 
 
 8
 No National Union representative had direct contact with the Turturs prior to their investments in ANA. In making their investments, the Turturs relied upon a private placement memorandum ("PPM") prepared by ANA and given to prospective ANA investors by representatives of Rothschild Reserve International, Inc. ("Rothschild"), the general partner of ANA. Both Rothschild and ANA were allegedly among a number of vehicles utilized by Barry M. Trupin to market tax sheltered limited partnerships engaged in the leasing of computer equipment. The PPM included the following statement:
 
 
 9
 Of the limited partnerships formed [by the Trupin organization] during the years 1977 through 1981, 24 are under audit by the IRS. Two of such partnerships have received a report of the engineering section of the IRS recommending that the depreciation deductions claimed by said partnerships be disallowed, alleging that said transactions lacked economic substance. The examining agents have indicated that similar issues may be raised with respect to other partnerships under examination. It is believed that such transactions are substantially dissimilar to the transaction contemplated hereby.
 
 
 10
 The Turturs contend that this statement was misleading because the transactions described in the foregoing quotation were not "substantially dissimilar" to those contemplated by the ANA program. They claim that the contemplated ANA transaction also "lacked economic substance," and was therefore virtually certain to result in disallowance of the income tax depreciation deductions which substantially motivated limited partnership investments in ANA.
 
 
 11
 The PPM included as one of its numerous attachments the Indemnification Agreement. According to an affidavit of Mario Turtur, Jr., "[t]he Indemnification Agreement is one of a package of documents which we were required to sign in order to invest in ANA." The Turturs represented and warranted in the Indemnification Agreement that they "ha[d] knowledge and experience in financial and business matters (or ha[d] qualified and sophisticated counsel) and accordingly, [were] capable of evaluating and ha[d] evaluated the merits and risks of investing in [ANA] and [were] able to bear the economic risk of such investment."
 
 
 12
 The Turturs paid the Notes which became due on March 15, 1983 and 1984, but not the Notes which became due on March 15, 1985. They claim that in early 1985, John Prowant, a former Rothschild executive with whom the Turturs had principally dealt in making their investments in ANA, informed Mario Turtur, Jr. that the ANA deal was a "sham" because "it was over valued for the tax benefits, and we don't even know whether they placed the equipment in service." This conversation allegedly confirmed information that Turtur had previously received from Kent Klineman, a New York City attorney and syndicator of computer equipment leasing partnerships, that the ANA equipment was overvalued. In a subsequent audit of the investment of Mario Turtur, Jr. in ANA, the Internal Revenue Service took the position that the investment was "lacking in economic substance because the property purchased by the partnership was grossly overvalued in an attempt to exaggerate tax benefits."
 
 
 13
 In May, 1985, Mario Turtur, Jr. telephoned the Bank to discuss the overdue Notes payable March 15, 1985, and was referred to National Union; Turtur then advised a National Union representative that the Turturs would not pay the remaining Notes because the ANA transaction was fraudulent. In accordance with the terms of the Guarantee, National Union thereupon paid the Bank $147,766.43 on behalf of the Turturs, representing the principal and interest due on the Notes payable March 15, 1985.
 
 
 14
 National Union then initiated the instant actions seeking reimbursement for this payment. National Union claimed its right to reimbursement from the Turturs on two theories. First, National Union sought reimbursement as an asserted subrogee of the Notes which ANA assigned to the Bank. It claimed that the Turturs had no valid defense to the Notes against the Bank as a holder in due course, and that National Union had the rights of a holder in due course as the Bank's transferee. Second, National Union claimed reimbursement pursuant to the terms of the Indemnification Agreements.
 
 
 15
 In the course of ensuing discovery, it was established that National Union reviewed the PPM and related documents prior to its involvement in the ANA transaction. It was further established that Irving V. Goldstein, a vice president of National Union responsible for computer equipment leasing bonds, attended a seminar on equipment leasing limited partnerships conducted by European American Bank on March 22, 1983, two days prior to issuance of the Guarantee, at which Goldstein received a memorandum which stated that another such Trupin partnership presented "a very aggressive structure with attendant risks." The Turturs also rely on the fact that Goldstein sent sample PPMs for several equipment leasing partnerships, including one organized by Trupin, to Coopers and Lybrand for review prior to issuing the Guarantee.
 
 
 16
 National Union moved for summary judgment, which the district court granted in an opinion and order dated May 6, 1988. The court declined to grant summary judgment to National Union as claimed subrogee of the Notes. Under N.Y.U.C.C. § 3-201(1) (McKinney 1964), a transferee of a holder in due course of a note does not succeed to that status if the transferee "has himself been a party to any fraud or illegality affecting the instrument." The district court held that the Turturs "have barely raised a factual issue" as to whether National Union was a party to any fraud concerning the partnership transaction, on the premise that it "was aware of the misstatements in the PPM before it issued [its guarantee]."
 
 
 17
 The district court did grant summary judgment to National Union, however, pursuant to the Indemnification Agreements. In doing so, the court rejected the Turturs' claims that: (1) the Turturs had defenses against the Bank to payment of the Notes, which National Union therefore improperly paid; (2) Rothschild representatives acted as agents of National Union in obtaining the Turturs' signatures on the Agreements; (3) the Agreements were not enforceable because they were part of a series of agreements procured by fraud; and (4) National Union had aided and abetted a violation of federal securities law because it knew of material misrepresentations in the PPM and made no disclosure thereof to the Turturs.
 
 
 18
 The court denied a motion for reargument by the Turturs in a subsequent opinion and order dated August 10, 1988. Judgment was then entered for National Union in both actions. This appeal followed. On appeal, the Turturs have pressed only the third and fourth of the contentions set forth in the preceding paragraph.
 
 Discussion
 
 19
 A. Summary Judgment.
 
 
 20
 Our role in reviewing the district court's grant of summary judgment is to determine whether a genuine issue of material fact exists and whether the law was applied correctly below. City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 45 (2d Cir.1988) (citing 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2716, at 654 (2d ed. 1983)). "Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the nonmoving party." Lund's, Inc. v. Chemical Bank, 870 F.2d 840, 844 (2d Cir.1989). To avoid summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added in Matsushita ).
 
 
 21
 Once the nonmoving party has come forward with specific facts in support of his claim, "the question of what weight should be assigned to competing permissible inferences remains within the province of the fact-finder at a trial." Apex Oil Co. v. DiMauro, 822 F.2d 246, 253 (2d Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). Finally, "[i]f the party opposing summary judgment 'generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate.' " Beacon Enters., Inc. v. Menzies, 715 F.2d 757, 762 (2d Cir.1983) (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980)).
 
 
 22
 On appeal, the Turturs claim that the district court erred in granting summary judgment because material issues of fact exist concerning their claims that: (1) the Indemnification Agreements, together with the subscription to the underlying investments, were part of a single overall contract that was procured by fraud and accordingly unenforceable; and (2) National Union aided and abetted a fraudulent securities scheme undertaken by the promoter of ANA. National Union contends that summary judgment enforcing the Indemnification Agreements was properly granted by the district court, and that National Union was entitled to summary judgment as subrogee of the Notes, as well. Applying the standards stated above, we reverse the district court's grant of summary judgment for the reasons which follow.
 
 
 23
 B. Indemnification Agreements Part of an Overall Contract Procured by Fraud.
 
 
 24
 It is clear that under New York law, a party may not compel performance of an agreement which that party has induced by fraud. See, e.g., Merry Realty Co. v. Shamokin & Hollis Real Estate Co., 230 N.Y. 316, 323, 130 N.E. 306, 308 (1921); B.V.D. Co. v. Marine Midland Bank-New York, 46 A.D.2d 51, 54, 360 N.Y.S.2d 901, 904-05 (1st Dep't 1974); Schweickert v. Schenectady Holding Co., 238 A.D. 220, 221, 265 N.Y.S. 158, 159 (3d Dep't 1933); New York Yellow Pages, Inc. v. Growth Personnel Agency, 98 Misc.2d 541, 542-43, 414 N.Y.S.2d 260, 262 (Civ.Ct.1979).
 
 
 25
 The Turturs contend that the Indemnification Agreements should be considered in tandem with the underlying subscription agreements by which they acquired their limited partnership interests, with the result that if the latter were induced by fraud, the Indemnification Agreements would be unenforceable. They further argue that genuine issues of material fact exist as to this issue, precluding summary judgment against them. We agree.
 
 
 26
 Normally, the question of the dependency of separate contracts arises in the context of an asserted breach of contract, rather than fraud in the inducement. See, e.g., Rudman v. Cowles Communications, 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867, 873 (1972); Lowell v. Twin Disc, Inc., 527 F.2d 767, 769-70 (2d Cir.1975). As stated in J. Calamari & J. Perillo, Contracts § 11-26 (3d ed. 1987), addressing "a situation where the parties have executed two contracts at substantially the same time":
 
 
 27
 The question is whether the two agreements are unrelated or part of the same exchange. If the two contracts are not part of the same exchange, a breach of one will have no effect on the other. If they are part of the same exchange, the question will be the over all materiality of the breach. The cases state that this is a question of intention but normally lean to the notion that the making of two separate contracts ordinarily indicates an intent that a failure to perform one contract will have no effect on the other contract.
 
 
 28
 Id. (footnotes omitted). Nonetheless, since fraud in the inducement, like a material breach, excuses performance by the other party to a contract, there would appear to be no reason in principle why, if two contracts are part of the same exchange, a fraudulent inducement as to one of the contracts might not, in at least some situations, excuse performance by the defrauded party of the other contract.
 
 
 29
 The district court dealt with this issue as follows:
 
 
 30
 In this case, the language of the indemnity agreements themselves establishes that they are separate contracts. In the indemnity agreements, the Turturs warrant that they are the owners of the limited partnership interests in which they grant National Union a security interest. This would not be possible if the partnership agreements in which the Turturs acquired those interests were not separate from the indemnity agreements.
 
 
 31
 There being no allegation that National Union procured the indemnity agreements themselves by fraud, they are enforceable without regard to the rest of the claimed "package."
 
 
 32
 We disagree. The issue of the dependency of separate contracts simply does not arise unless more than one contract is under consideration. Accordingly, the issue is not resolved by specifying the existence of multiple contracts. Rather, as we stated in Lowell v. Twin Disc, Inc.:
 
 
 33
 Two separate written agreements executed at the same time may be considered in law as one agreement, but only if the parties so intended. Whether the parties intended that the two agreements should be interdependent is a question of fact which turns upon the circumstances of each case. See Commissioner v. Le Gierse, 110 F.2d 734, 735 (2d Cir.1940), rev'd on other grounds, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996 (1941); Sterling Colorado Agency, Inc. v. Sterling Insurance Co., 266 F.2d 472, 475-76 (10th Cir.1959); 6 Williston on Contracts § 863, at 279-80 (3d ed. W. Jaeger 1962). As Williston put it, the test is as follows: "It can be nothing else than the answer to an inquiry whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." Id. at 275.
 
 
 34
 527 F.2d at 769-70.
 
 
 35
 Similarly, the New York Court of Appeals has stated: "Whether the parties intended to treat both agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact. In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances." Rudman v. Cowles Communications, 30 N.Y.2d at 13, 330 N.Y.S.2d at 42, 280 N.E.2d at 873 (citations omitted); see also Dynamics Corp. of Am. v. International Harvester Co., 429 F.Supp. 341, 345-46 (S.D.N.Y.1977); Kurz v. United States, 156 F.Supp. 99, 103-04 (S.D.N.Y.1957), aff'd, 254 F.2d 811 (2d Cir.1958) (per curiam) (adopting district court opinion).[3]
 
 
 36
 National Union does not contend that the variation of parties between the underlying subscription agreement (between Rothschild and the Turturs) and the Indemnification Agreement (between National Union and the Turturs) compels a conclusion that the contracts are not interdependent, and we see no basis in New York law for such a position. Cf. Rudman v. Cowles Communications, 30 N.Y.2d at 13, 330 N.Y.S.2d at 42, 280 N.E.2d at 873 (execution of agreements by formally different parties a factor tending against finding of interdependence).
 
 
 37
 The issue of the dependency of separate contracts, therefore, boils down to the intent of the parties. Questions of intent, we note, are usually inappropriate for disposition on summary judgment. See Wechsler v. Steinberg, 733 F.2d 1054, 1058-59 (2d Cir.1984). Moreover, the record indicates that the indemnity agreements and all other agreements constituting the ANA investment package were presented to investors together, and all of the documents had to be signed for the investments to be consummated. Indeed, an affidavit of Mario Turtur, Jr.--uncontradicted by National Union--asserts that he signed the partnership subscription agreement, the promissory notes and the Indemnification Agreement as part of one whole transaction, and that entering into the Indemnity Agreement was a necessary prerequisite to acquiring an interest in ANA.
 
 
 38
 As to fraud in the inducement, the district court concluded, in rejecting National Union's effort to attain summary judgment as a claimed subrogee of the Notes, that the Turturs "barely raised a factual issue" whether National Union was "a party to any fraud or illegality affecting the [Notes]" within the meaning of N.Y.U.C.C. § 3-201(1) (McKinney 1964). Since, as will appear, we affirm this ruling, it also suffices to establish a genuine issue of material fact as to fraud in the inducement for purposes of the instant issue.
 
 
 39
 C. National Union's Claim as Asserted Subrogee of the Notes.
 
 
 40
 National Union sought reimbursement as an asserted subrogee of the Notes due March 15, 1985 which ANA assigned to the Bank and National Union paid following default by the Turturs. The district court denied National Union's motion for summary judgment on this claim. National Union now challenges this determination.
 
 
 41
 The governing rule is provided by N.Y.U.C.C. § 3-201(1) (McKinney 1964), which states that:
 
 
 42
 Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.
 
 
 43
 This provision echoes the definition of a holder in due course under N.Y.U.C.C. § 3-302(1) (McKinney 1964), as inter alia, one who takes an instrument "without notice ... of any defense against it or claim to it on the part of any person."
 
 
 44
 The Turturs claim that National Union was a party to the fraud perpetrated by Trupin. They allege that they relied on the PPM, that it contained material misstatements of which National Union was aware before it issued the bond, and that National Union failed to disclose that the transaction was fraudulent.
 
 
 45
 The district court ruled on this contention as follows:The Turturs have barely raised a factual issue as to whether National Union was aware of the misstatements in the PPM before it issued the bond, (assuming that such knowledge would make National Union such a "party to [a] fraud or illegality affecting the [notes]" as to disable it from improving its position by suing as the Bank's subrogee, in harmony with U.C.C. § 3-302's requirement that a holder in due course be without notice of any defense or fraud). They allege that National Union was on notice of the fraud because its Vice President, Mr. Goldstein, had attended a seminar concerning computer equipment leasing transactions, where another Trupin enterprise--Chase Associates--was given as an example of problems with the structure of several computer equipment leasing partnerships. Whether the information Mr. Goldstein was exposed to, or the other information available to National Union, was sufficient to put it on notice that the PPM was fraudulent are questions on which the Turturs may not ultimately prevail, but they appear appropriate for resolution at trial rather than summarily.
 
 
 46
 National Union claims that there is no evidence of material misstatements in the PPM, or of its knowledge of any such misstatements. As to the misstatements, National Union notes that the PPM revealed that predecessor limited partnerships had been challenged on audit by the Internal Revenue Service. If, however, as the Turturs contend, (1) the ANA transaction was not "substantially dissimilar" to the prior transactions that resulted in tax audits, as the PPM represented; and (2) the equipment involved in the ANA transaction was valued so excessively as virtually to ensure that the claimed tax benefits would not be achieved, a revelation of prior tax audits would not preclude a finding of material misrepresentation, especially in the context of a summary judgment determination. As to National Union's knowledge of any misrepresentations in the PPM, we agree with the district court's carefully phrased assessment that the Turturs "have barely raised a factual issue" in that respect. We accordingly affirm the district court's denial of summary judgment on National Union's subrogation claim.
 
 
 47
 D. Aiding and Abetting a Violation of Federal Securities Law.
 
 
 48
 The Turturs contend that the district court erred in rejecting their claim that National Union aided and abetted a fraudulent scheme in violation of federal securities law. The defendants sought to amend their answer to assert this claim as "an additional counterclaim." Although no formal amendment occurred, the district court addressed and dismissed this contention, finding it to be without merit. We agree with that disposition.
 
 
 49
 The substance of the Turturs' contention is that there were material misstatements in the PPM for which National Union may be held legally accountable. Although the Turturs do not specify what provision of the federal securities laws has been violated, we assume that they claim a violation of section 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b) (1982), and rule 10b-5, 17 C.F.R. § 240.10b-5 (1988), promulgated thereunder.[4] It is claimed that National Union aided and abetted a securities fraud because it knew of misstatements in the PPM and failed to disclose them to the Turturs.
 
 
 50
 In rejecting this claim, the district court placed explicit reliance upon IIT v. Cornfeld, 619 F.2d 909 (2d Cir.1980). That case makes clear that to establish an aiding and abetting securities violation, there must be shown (1) a securities law violation by a primary party, (2) scienter on the part of the aider and abettor, and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation. 619 F.2d at 922. In connection with the third requirement, we said: "Apart from a case like [Brennan v. Midwestern United Life Ins. Co., 417 F.2d 147 (7th Cir.1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970) ], inaction can create aider and abettor liability only where there is a conscious or reckless violation of an independent duty to act." 619 F.2d at 927. Brennan involved a corporation that refrained from reporting to regulatory authorities its knowledge that a broker was manipulating its stock, "which had the effect of increasing the value of [the corporation's] over-the-counter stock, to the benefit of [the corporation's] efforts to accomplish a merger with another company." 619 F.2d at 926.
 
 
 51
 We viewed Brennan as posing an exception to the general rule because of the offending corporation's "conscious and specific motivation for not acting." Id. at 927. If we were to extend that exception to National Union, whose sole apparent motive was to collect the premium for its Guarantee, the exception would swallow the rule, since almost any entity playing a role in a securities transaction will have some economic motivation for doing so. Rather, as we stated more recently in Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir.1983), inaction can provide a basis for liability, in the absence of a duty to act, only when "designed intentionally to aid the primary fraud." The Turturs have not raised a genuine issue of material fact concerning any such participation by National Union in the alleged fraud by ANA. They must therefore establish some duty to act on the part of National Union.
 
 
 52
 The district court correctly found, however, that National Union owed no duty of disclosure to the Turturs. Such a duty "arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.' " Chiarella v. United States, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (quoting Restatement (Second) of Torts § 551(2)(a) (1976)); see also Dirks v. S.E.C., 463 U.S. 646, 654-55, 103 S.Ct. 3255, 3261-62, 77 L.Ed.2d 911 (1983). It is clear that the Turturs, who never dealt directly with National Union, had no contacts or transactions with National Union from which a relationship of trust and confidence could be established.[5] Moreover, in general, a surety does not owe a fiduciary duty to its principal. See In re McNeil, 22 B.R. 408, 413 (E.D.Tenn.1982); cf. Schlifke v. Seafirst Corp., 866 F.2d 935, 945 (7th Cir.1989) ("Execution of a contract in support of a bank loan, in itself, falls far short of creating a fiduciary relationship."); Schneberger v. Wheeler, 859 F.2d 1477, 1480 (11th Cir.1988) (lending bank had no fiduciary duty to borrowers who invested loan proceeds in limited partnership), cert. denied, --- U.S. ----, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989); Jett v. Sunderman, 840 F.2d 1487, 1493 (9th Cir.1988) (same). In view of the undisputed facts and the applicable precedents, we see no basis to impose a duty of disclosure to the Turturs upon National Union, and accordingly no liability for a violation of federal securities law. This claim was therefore properly dismissed upon National Union's motion for summary judgment.
 
 Conclusion
 
 53
 The judgment of the district court is affirmed insofar as it denied summary judgment to National Union on its claim as subrogee of the Notes and dismissed the Turturs' defense and/or counterclaim that National Union aided and abetted a federal securities violation, but reversed and remanded for further proceedings not inconsistent with this opinion insofar as it granted summary judgment to National Union enforcing the Indemnification Agreements.
 
 
 
 [1]
 The separate actions against Mario Turtur and his two sons were informally coordinated below, and were jointly briefed and argued on this appeal
 
 
 [2]
 The indemnity agreements, the notes and the guarantee which, as hereinafter explained, are the key documents in this litigation provide that they will be construed in accordance with New York law, and the district court proceeded on this basis, as did the parties on appeal. We note, however, that the Turturs assert a defense under federal securities law which will, of course, be considered in terms of that law
 
 
 [3]
 The Turturs cite in their reply brief two recent cases in New York State courts in which National Union brought suit in assertedly similar situations and was denied summary judgment. See National Union Fire Ins. Co. v. Kornreich, No. 7795/88 (Sup.Ct.N.Y.Cnty. filed Aug. 22, 1988), aff'd, 540 N.Y.S.2d 120 (App.Div. 1st Dep't 1989); National Union Fire Ins. Co. v. Kay, No. 12994/87 (Sup.Ct.N.Y.Cnty. filed August 21, 1987), appeal dismissed, No. M-5120 (App.Div. 1st Dep't Jan. 5, 1989). The defendants in these cases were apparently not investors in ANA. On the basis of the limited information made available to us, these cases have little precedential value in determining the issues on this appeal
 
 
 [4]
 The Turturs also assert that section 29(b) of the Act, 15 U.S.C. § 78cc(b) (1982), provides a defense to National Union's attempted enforcement of the Indemnification Agreements. This section renders "void," for certain purposes, any contract whose "performance ... involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder." Since we hereinafter conclude that no violation of section 10(b) of the Act or rule 10b-5 survives National Union's motion for summary judgment, we do not reach any issue posed by section 29(b) of the Act
 
 
 [5]
 The Turturs claim that Rothschild was an agent of National Union, and that Rothschild's duty to disclose is therefore imputed to National Union. However, as the district court correctly pointed out, no such agency relationship has been established because the element of control by National Union is totally lacking. See In re Shulman Transp. Enters., Inc., 744 F.2d 293, 295 (2d Cir.1984) (essential characteristic of agency relationship is that agent acts subject to principal's direction and control)