**In re GAS RECLAMATION, INC. SECURITIES LITIGATION.**

MDL No. 665 (LBS).
No. M–21–41.

United States District Court,
S.D. New York.

March 27, 1990.

Sylvor, Schneer, Gold & Morelli (Richard L. Gold, Iris S. Richman, of counsel), New York City, for Abish Investors, Bard Investors, Herbert W. Katz and Manuel L. Katz.

Page & Addison (Douglas M. Robison, of counsel), Geary, Stahl & Spencer (John T. Palter, of counsel), Dallas, Tex., for Breese Investors.

Weil, Gotshal & Manges (Dennis J. Block, H. Adam Prussin, Andrea J. Roth, Mark G. Krum, Robert W. Rodriguez, Timothy Parlin, Belinda Munday, of counsel), New York City, for Northwestern Nat. Ins. Co. of Milwaukee, Wis.

## OPINION

SAND, District Judge.

In this multidistrict case consolidated before this Court for pretrial matters, investors in Gas Reclamation, Inc. ("GRI") bring suit for violations of federal securities laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO") and vari-

ous state statutory and common laws. We consider now the motion for summary judgment brought by Northwestern National Insurance Company of Milwaukee, Wisconsin ("Northwestern")[1] and the cross-motions for summary judgment brought by two separate groups of plaintiffs, (1) the Breese Investors and (2) the Abish Investors, the Bard Investors, Herbert W. Katz and Manuel L. Katz (collectively, the "Abish Investors"). The Court has also received papers in opposition to Northwestern's motion from Robert A. Hudson and Alan S. Cummings, two other investors in GRI.

In our Opinion of April 9, 1987 (published at 659 F.Supp. 493 (S.D.N.Y.1987)), familiarity with which is assumed, this Court described in detail the factual background of these cases. Each of the plaintiff-investors purchased one or more Gas Reclamation Units ("Units") from defendant GRI pursuant to a Private Placement Memorandum ("PPM") dated April 12, 1984. The Units included an agreement to purchase from GRI a gas recovery and refrigeration plant and an agreement that GRI would install and maintain the plant on behalf of each investor. The gas plants were designed to condense natural gas through refrigeration into liquid natural gas. Each investor borrowed 95 percent of the purchase price from either The Connecticut National Bank, Ensign Bank FSB, Morris Savings Bank or Privatbanken A/S (collectively, the "Banks"). Northwestern issued surety bonds guarantying the investors' payments on their notes to the Banks, and each investor also executed an indemnification agreement promising to reimburse Northwestern for any payments or other damages Northwestern might incur under the surety bonds.

The investors' first payments on their notes were due in January or February, 1985. When the investors did not receive any income from the operation of their gas recovery plants, virtually all of them defaulted on their notes. In February, 1985,

GRI filed for bankruptcy under Chapter 11. The Banks thereafter demanded payment from Northwestern pursuant to the surety bonds. Northwestern continued to make payments as they became due on the investors' notes until October, 1987. The investors filed suit against GRI, its principals, the brokers who sold the Units, and Northwestern. Northwestern seeks in its counterclaims to recover from the investors the payments it has made or will make to the Banks.

The Abish Investors and the Breese Investors argue in their cross-motion for summary judgment that the surety bonds and indemnification agreements are void under section 29 of the Securities Exchange Act of 1934. Northwestern argues in support of its motion for summary judgment that there is no factual basis for the claims asserted in the Consolidated Complaint against Northwestern for violations of section 10(b) of the Securities Exchange Act of 1934, section 12 of the Securities Act of 1933, civil RICO, and various state statutory and common laws. We consider each of these claims in turn.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." "[T]he substantive law will identify which facts are material," and a genuine dispute exists if a reasonable jury viewing the evidence could decide in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must "resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

All the claims before the Court rely principally on disputed facts concerning the

---

**1.** Defendant Michael Makris, appearing *pro se,* filed a motion for summary judgment with three subsequent amendments. Most of his arguments are more appropriately construed as opposition to Northwestern's motion. To the extent Makris also moves for summary judgment, we find genuine issues as to material facts and therefore deny his motion.

nature and extent of the activities of Allan Esrine. After examining the numerous deposition extracts and exhibits provided by the parties to these motions, we find that a reasonable jury could conclude from the evidence that Esrine acted as Northwestern's agent. Esrine worked as a financial intermediary by soliciting banks and sureties to participate in bonded investor note financings. The parties do not dispute that in March, 1984, Esrine sent a draft of the GRI PPM to Harold Recard, Northwestern's underwriter of financial guarantee bonds, to determine whether Northwestern would be interested in issuing bonds in connection with the GRI transaction. After Northwestern decided to issue bonds to qualified purchasers of GRI Units, Esrine solicited Intercontinental Monetary Corp. ("IMC") and later Privat-Banken A/S to lend funds against the investors' notes. While Northwestern denies that Esrine acted as its agent, Northwestern concedes, as it must, that for the purposes of this motion for summary judgment, this Court must assume *arguendo* that such an agency relationship existed. *See* Memorandum in Support of Northwestern's Motion for Summary Judgment at 5 [hereinafter Northwestern's Memorandum].

This Court also finds that genuine issues of fact exist concerning the extent of Esrine's activities. A reasonable jury could find that Esrine helped structure the financing of the GRI offering, reviewed drafts of the PPM and proposed revisions to them. *See* Affidavit of Richard L. Gold in Opposition to Northwestern's Motion for Summary Judgment and in Support of the Abish Investors' Cross–Motion for Summary Judgment ¶¶ 63, 80ff [hereinafter Gold Affidavit]. A jury could also conclude that Esrine knew about and distributed the Jordan Program Checks, an allegedly misleading summary of historical production and financial data for several units. *See* Gold Affidavit ¶ 115. Additional testimony supports a finding that Esrine drafted a letter sent from Bob Jordan to several investors in October, 1984 which falsely stated that Northwestern had "thoroughly examined" the GRI offering, *see* Jordan dep., pp. 541–42, and that Esrine attended various closings of Northwestern transactions where he delivered Northwestern bonds and collected the bond premiums for Northwestern, *see* Recard dep., p. 891. From the evidence compiled in the deposition extracts and exhibits submitted with these motions, a reasonable jury could conclude that Esrine knew that GRI was severely undercapitalized and that Makris, a convicted felon, played an important role in the day-to-day operations of GRI.

## Section 29

In their cross-motions for summary judgment, the Abish Investors and the Breese Investors seek a declaration that the "Waiver of Defenses" provisions in the surety bonds are void under section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78cc(a) (1981), and rescission of their indemnity agreements with Northwestern under section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78cc(b) (1981).[2]

The financial structure of the GRI private placement centered on agreements between three groups of parties: the investors, the Banks and Northwestern. The investors borrowed 95 percent of the units' purchase price from the Banks as evidenced by the promissory notes. Northwestern simultaneously issued surety bonds to the Banks guarantying the investors' payments on their notes, and the investors signed indemnification agreements with Northwestern promising to reimburse Northwestern for any payments or other damages Northwestern might incur under the surety bonds.

The parties agree that the surety bonds issued by Northwestern to the Banks included the following waiver, first as a rider to the surety bonds and then as a provision in the surety bonds themselves:

**2.** Although the Consolidated Complaint does not specifically allege claims pursuant to section 29, the Abish Investors and the Breese Investors argue, and Northwestern does not contest, that section 29 claims need not be pled specifically as long as the facts relied upon are pled.

9A. *Waiver of Defenses*

... The following shall not relieve the Surety [Northwestern] of its obligations to the Permitted Assignee [Bank] under this Bond:

a. Any misinformation, breach of warranty, fraud, misrepresentation or failure to provide any information by any Principal [investor] or the Obligee [Bank or GRI] or any other person (except the Permitted Assignee).

b. Any violation of the securities laws of the United States or of any state of the Obligee, the Permitted Assignee or any other person in connection with the transaction in which the Notes were issued.

c. Any defect in any Note that renders such Note void, voidable, unenforceable or uncollectible, in whole or in part, or subject to any set-off, claim or defense, real or personal, including, without limitation, fraud, forgery or usury.

d. The failure of the Permitted Assignee or any payee or endorsee of any Note to be a holder-in-due-course or the non-negotiability of any Note.

...

*See* Gold Affidavit at ¶¶ 71–72; Aff.Ex. 64; Northwestern's Deposition Exhibits Cited in Memorandum of Law, Ex. 10. Paragraph 3 of the surety bonds also provides for a similar waiver of defenses:

Defenses available to the Surety [Northwestern] or any Principal [investor] against the Obligee [Bank or GRI] or Permitted Assignee [Bank] to deny payment of the Notes or of a claim under this Bond due to acts or omissions of the Obligee or Permitted Assignee, or other entity or person (except for changes in the Notes made without the written consent of the Surety or for acts of gross negligence or willful misconduct by the Permitted Assignee) shall not be valid against the Permitted Assignee. Such defenses include but shall not be limited to:

a) the invalidity of any Note;

b) the illegality of any Note;

c) the unenforceability of any Note;

d) the bankruptcy of the Obligee or any Principal;

e) Any defense that the Principal is under no obligation to discharge all or any part of its obligations to the Obligee, Permitted Assignee, or any other person under the Note, including any defense relating to the assignment of the Notes or any Principal(s) interest in the Obligee to the Permitted Assignee; and

f) any defense based upon the failure of any Principal to execute this Bond or the failure of the Obligee to perform its obligations under this Bond (other than under paragraph 4).

*See* Northwestern's Dep.Ex. 10. Surety bonds which incorporated the "9A. Waiver of Defenses" paragraph as a provision in the bonds themselves added as an additional clause to the above-quoted waiver in paragraph 3: "g) those specific defenses waived under the provision of paragraph 9A."

■ First, the Abish Investors and the Breese Investors argue that these waiver of defenses provisions are void under section 29(a). That statute provides:

(a) Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

15 U.S.C.A. § 78cc(a) (1981). These waiver of defenses provisions clearly require Northwestern to make payments to the Banks even when the investors have valid securities laws defenses to payment of their promissory notes. That commitment by an unconditional surety, however, does not constitute a waiver of compliance with the federal securities laws as long as the bank did not violate those laws. The parties have not agreed to permit violations of the federal securities laws, but have agreed that the surety will not be relieved from its obligation to pay even if such illegal conduct by others occurs. Such a waiver does not circumvent the protections offered by the federal securities laws, but only effects the distribution of loss when such a violation occurs. In fact, these waivers simply

give the bank the same rights as any holder in due course. *See Schneberger v. Wheeler,* 859 F.2d 1477, 1482 (11th Cir. 1988) ("Because U.S. Trust is a holder in due course of the promissory notes, none of appellants' defenses [including securities law defenses] ... are available against U.S. Trust."), *cert. denied,* — U.S. —, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989). Since the waiver provisions do not apply if the Banks themselves commit fraud, we hold that those waivers are not void under section 29(a).

This ruling is consistent with the policy judgment reflected in section 29(c). That subsection provides: "Nothing in this chapter shall be construed ... (2) to afford a defense to the collection of any debt or obligation ... by any person who shall have acquired such debt [or] obligation ... in good faith for value and without actual knowledge of the violation of any provision of this chapter...." 15 U.S.C.A. § 78cc(c) (1981). Section 29(c) clearly permits innocent lenders to collect directly from debtors even if other parties have violated the federal securities laws. We decline to construe section 29(a) to prevent the same innocent lender from collecting pursuant to a surety bond that waives federal securities law defenses to the underlying promissory notes.

■ Second, the Abish Investors and the Breese Investors argue that pursuant to section 29(b), the indemnity agreements in their entirety are void. That section provides:

(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder ... [and those] the performance of which involves the violation of ... any provision of this chapter or of any rule or regulation thereunder ... shall be void (1) as regards the rights of any person who, in violation of any such provision, rule or regulation, shall have made or engaged in the performance of any such contract ...

The Fifth Circuit has ruled that "a person can avoid a contract under section 29(b) if he can show that (1) the contract involved a 'prohibited transaction,' (2) he is in contractual privity with the defendant, and (3) he is 'in the class of persons the Act was designed to protect.'" *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.,* 678 F.2d 552, 559 (5th Cir. 1982) (quoting *Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357, 362 (5th Cir.1968)).

The Abish Investors and the Breese Investors argue that the indemnity agreements are void under section 29(b) since those contracts were procured by fraud in violation of section 10(b) and Rule 10b–5. Clearly, the investors are in contractual privity with Northwestern and are " 'in the class of persons the [Securities] Act was designed to protect.'" *Regional Properties,* 678 F.2d at 559. The Abish Investors and the Breese Investors claim that the indemnity contracts were made in violation of the securities laws because the PPM failed to disclose that the surety bonds between Northwestern and the Banks waived defenses that the investors could assert against the Banks on their promissory notes. Since the investors claim that the promissory notes are non-negotiable, and that therefore the Banks are not holders-in-due-course, the investors argue that absent those waivers, they would have valid defenses to payment. The investors also argue that the indemnity agreements must be treated as part of one integrated investment transaction and must be construed as part of a single contract which included the promissory note, the surety bond and the GRI purchase agreement. *See National Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203–05 (2d Cir.1989); *Vince Hagen Co. v. Eighty–Eighty Cent. Partners, Ltd.,* 1989 WL 136870, 1989 U.S. Dist. LEXIS 13432 (N.D.Tex., Nov. 7, 1989). Therefore, Northwestern's participation in the other allegedly fraudulent representations and material non-disclosures makes the indemnity contract part of a prohibited transaction under section 29(b).

Since this Court finds that there are genuine disputes as to the material facts supporting the investors' fraud claims, we deny summary judgment on their section

29(b) cross-claims. The parties dispute whether the investors knew about the waiver of defenses provisions. To support their claims of nondisclosure, forty-five of the Abish Investors have submitted affidavits claiming that they were never advised and did not know that Northwestern waived their defenses to payment of their promissory notes. Northwestern replies that at least thirty-two of those investors signed estoppel letters addressed to one of the Banks which expressly waived any defenses those investors had to payment of the notes. For the purposes of this motion, we cannot decide whether Northwestern fraudulently failed to disclose the waiver of defenses provisions.

Whether or not the indemnity agreements should be treated as part of a single contract with the other documents in the PPM also depends on issues of disputed fact. *See Turtur*, 892 F.2d at 204 (quoting *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 769–70 (2d Cir.1975)) (" 'Two separate written agreements executed at the same time may be considered in law as one agreement, but only if the parties so intended. Whether the parties intended that the two agreements should be interdependent is a question of fact which turns upon the circumstances of each case.' ") (citations omitted). Even if the indemnity contracts are considered part of the PPM, the disputed facts as to Esrine's status as Northwestern's agent and Esrine's involvement in the alleged fraud would also preclude the granting of summary judgment on the investor's section 29(b) cross-claims.

To summarize, we deny summary judgment on the Abish Investors' and the Breese Investors' cross-claims under section 29(a) to void the waiver provisions in the surety bonds. We also deny summary judgment on their cross-claims under section 29(b) to void the indemnity agreements in their entirety. We express no opinion on the merits of Northwestern's equitable defenses to the claims for rescission.

### Section 10(b)

■ The First Cause of Action in the Sixth Amended Consolidated Complaint ("Consolidated Complaint") alleges that Northwestern aided and abetted violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) (1981), and Securities and Exchange Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The alleged primary violators are the GRI and broker parties. Aiding and abetting a violation of the federal securities laws requires (1) a primary violation by another party, (2) knowledge of the violation by the aider and abetter and (3) substantial assistance by the aider and abetter. *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980); *In re GRI*, 659 F.Supp. at 502. For the purposes of its motion for summary judgment, Northwestern assumes *arguendo* satisfaction of the first element, that a primary violation was committed. Northwestern's Memorandum at 62 n. 57. Northwestern argues that it did not have any knowledge of the alleged fraud and that it did not provide substantial assistance to the primary violators.

■ If the aider owes a duty of disclosure to the defrauded party, proof of recklessness will suffice to establish scienter. Absent such a duty, the plaintiffs must prove that the aider had actual knowledge of the fraud and an intent to aid and abet the wrongful act. *National Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1381–83 (S.D.N.Y.1989) (citing cases). A surety generally does not have a duty to disclose information to its principal. *See National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 207 (2d Cir.1989) (citing cases). However, since the investors have provided sufficient evidence for the purposes of this summary judgment motion to satisfy the more stringent scienter requirement, we do not decide whether proof of recklessness alone would be sufficient in this case.

■ Northwestern claims that it "was aware of nothing in the PPM or in any of the circumstances of the offering to raise any suspicions about GRI." Northwestern's Memorandum at 37. Assuming that Northwestern had no direct knowledge of the misrepresentations and omissions alleged, a reasonable jury could nevertheless

conclude that Esrine, as Northwestern's agent, knew about the primary securities violations alleged in paragraphs 69 and 70 of the Consolidated Complaint. Some of the evidence indicates that Esrine reviewed drafts of the PPM and solicited from Jordan the Jordan Program Checks. *See* Gold Affidavit, ¶¶ 80ff, 115. In addition, the acts of substantial assistance discussed below provide sufficient circumstantial evidence to infer Esrine's knowledge of the primary fraud and intent to aid the primary violators. *In re GRI*, 659 F.Supp. at 503–04.

Both Second Circuit and Fifth Circuit law require that the substantial assistance of the alleged aider and abettor directly cause the plaintiff's losses. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61–62 (2d Cir.1985); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1117 (5th Cir.1988), *vacated on other grounds sub. nom. Fryar v. Abell*, — U.S. —, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989); *In re GRI*, 659 F.Supp. at 524. Courts draw a distinction between the required loss causation and transaction causation:

> To prove causation the bondholders [plaintiffs] must prove "that the untruth was in some reasonably direct, or proximate, way responsible for [their] loss. The causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation touches upon the reasons for the investment's decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant[s], but are not the proximate reason for [their] pecuniary loss, recovery under the Rule is not permitted."

*Abell*, 858 F.2d at 1117 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.1981) (footnote omitted)). As the Seventh Circuit recently explained in *Bastian v. Petren Resources Corp.*, " '[l]oss causation' is an exotic name—perhaps an unhappy one—for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren Resources*

*Corp.*, 892 F.2d 680, 685 (7th Cir.1990) (citations omitted). Allegations that but for the fraudulent statements and omissions, the plaintiffs would not have invested in the transaction in which they lost money are not sufficient. Instead, plaintiffs must prove that but for the circumstances that the fraud concealed, the investment would not have lost its value.

The Consolidated Complaint alleges that Northwestern provided substantial assistance to the primary securities violations by:

1. reviewing and approving the PPM;

2. assisting in the preparation of marketing materials for GRI and devising the marketing strategy and atypical financing scheme;

3. placing its badge of approval on the transaction;

4. permitting GRI to represent that Northwestern had thoroughly investigated the GRI program when in fact it had not;

5. permitting the use of the Jordan Program Checks;

6. permitting the dissemination of an allegedly misleading tax opinion;

7. procuring funding sources for GRI;

8. bonding the notes, including notes of investors whose finances it had not adequately investigated, even after learning of investor defaults and allegations of fraud;

9. ratifying the fraud by continuing to accept and retain premiums after learning of the fraud;

10. failing to insure that the offering was registered with the SEC and relevant state authorities.

Consolidated Complaint ¶¶ 79, 80. Northwestern argues that the losses incurred by the investors were not proximately caused by any of the above-listed acts of substantial assistance. Rather, Northwestern contends that GRI failed because of looting and mismanagement by GRI insiders— "that GRI insiders siphoned off millions of dollars of GRI funds for their own personal use and benefit; that many of the GRI units were installed improperly, at wells with inadequate flow of recoverable gas;

and that the units were probably not designed well enough to operate properly." Northwestern's Memorandum at 3; *see also id.* at 15–26. Since Northwestern did not participate in and did not know about this looting and mismanagement, Northwestern claims that the allegations in the Consolidated Complaint do not satisfy the loss causation requirement.

First, we note that there is a genuine dispute as to the reasons for the failure of GRI. Northwestern attempts to draw a distinction between the irresponsible and criminal acts of the individuals responsible for managing GRI and the underlying merits of the GRI program. Northwestern seemingly argues that if GRI had been run by competent people, the gas refrigeration plants would have performed as promised. The investors, on the other hand, argue that the units could not have produced the income promised even if run properly. Since a reasonable jury could conclude that GRI failed both because of "mismanagement" and "looting" and because of the undercapitalization and unsound business plan of GRI, we must assume that the GRI program failed for all the above reasons.

We agree with Northwestern that acts alleged in items 3, 4, 6, 7, 8, 9, and 10 do not satisfy the loss causation requirement. Even assuming that Northwestern or its agent Esrine did engage in the conduct alleged, those acts at most constitute "but for" transaction causation: "but for" Northwesterns' issuance of bonds and endorsement of the GRI offering, the investors would not have invested in the transaction. Those allegations do not proximately relate to the reasons for the losses incurred. *See Brant v. CCG Fin. Corp.,* 693 F.Supp. 889, 894 (D.Or.1988) ("[M]inisterial acts" by a surety, including "reviewing and preparing documents necessary to complete the issuance of the bond" do not amount to substantial assistance); *In re GRI,* 659 F.Supp. at 524 ("[T]he acts of procuring indemnity agreements, bond applications, and premium insurance do not constitute substantial assistance.").

Northwestern, however, concedes that the acts alleged in items 1, 2, and 5 might satisfy the loss causation requirement "because the PPM, the marketing materials and the Jordan Program Checks all relate in one way or another to the capabilities of the GRI units and GRI personnel to produce profits for investors." Northwestern's Memorandum at 63. We agree. Misrepresentations and omissions concerning the projected capabilities and past performance of the gas reclamation units do proximately relate to the alleged reasons for the investors' losses.

Northwestern argues that it did not in fact provide the assistance alleged. After reviewing the deposition extracts and exhibits submitted, we conclude that assuming that Esrine acted as Northwestern's agent, there is sufficient evidence to support a reasonable jury's conclusion that Esrine did participate in the acts alleged in items 1, 2 and 5. We therefore deny Northwestern's motion for summary judgment with respect to the aiding and abetting claims contained in First Cause of Action of the Consolidated Complaint.

### *Section 12*

Section 12(1) of the Securities Act of 1933, 15 U.S.C.A. § 77*l* (1) (1981), imposes civil liability against any person who offers or sells an unregistered security that is in violation of the registration requirements of section 5(a), 15 U.S.C.A. § 77e (1981). Section 12(2) of the Securities Act of 1933, 15 U.S.C.A. § 77*l* (2) (1981), imposes civil liability against any person who offers or sells a security by means of a prospectus which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statement not misleading. The Second and Third Causes of Action in the Consolidated Complaint allege that Northwestern in violation of these sections "substantially participated in the offer and sale of these securities [GRI units] ... and/or conspired with the GRI Parties and Broker Parties to make such offers and sales of securities." Consolidated Complaint ¶¶ 95, 102. In our previous decision on Northwestern's motion to dismiss, we held that Northwestern qualified as a "seller" for the purposes of section 12 since the complaint alleges that

"Northwestern, *inter alia,* assisted in the preparation of marketing materials for GRI and bonded the promissory notes provided by investors." *In re GRI,* 659 F.Supp. at 508–09.

Since our decision, the Supreme Court addressed the issue of nontransferor liability under section 12(1) in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The Supreme Court rejected the substantial factor test and restricted section 12(1) liability to those who pass title to the securities and those who solicit the purchase of securities for financial gain. *Id.* The Second Circuit subsequently held that the *Pinter* definition of a seller applies to claims under section 12(2) as well. *Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124 (2d Cir.1989). Section 12, therefore, requires more than allegations of substantial participation and conspiracy.

The investors allege that Esrine, acting as Northwestern's agent, solicited purchases of the GRI securities from prospective investors. Section 12 by its terms provides that a seller "shall be liable to the person purchasing such security from him...." Each investor, therefore, must prove that Esrine, as Northwestern's agent, personally solicited him or her. Esrine testified that he never spoke to any investor about the merits of the GRI deal, but only occasionally instructed investors and salesmen how to fill out some of the documents. Esrine dep., pp. 2156–59, 2170–75. The investors, therefore, must present contradictory evidence to support their claim that Northwestern, through its agent Esrine, directly solicited the purchase of GRI units from the investors.

The Abish Investors claim that "Esrine was involved in both formal and informal sales presentations during which GRI units were marketed." Gold Affidavit, ¶¶ 102. However, the only evidence provided concerns a sales presentation at the Marine Midland Club during the Summer, 1984. Reifer, a broker party, testified that Esrine attended and was introduced as "arranging for the financing of the transaction," but Reifer did not "recall his [Esrine's] presen-

tation, if he had one." Reifer dep., pp. 365, 374. Reifer also testified that he did not know whether Esrine spoke to any potential investors after the formal presentation. Reifer dep., pp. 376–77. None of the investors has testified that he or she directly spoke to Esrine at that or any other sales presentation and since Reifer does not recall any presentation by Esrine, we accept Esrine's testimony that he did not directly speak to potential investors at any general sales meeting.

First, only Frank Mangiatordi and Jerry Giovinazzo, the only investors who may have attended this sales presentation, can claim to have been solicited by Esrine. Reifer dep., pp. 363, 379. Second, while it is a close question, evidence that Esrine attended this sales presentation and was introduced as the individual responsible for the financing is not sufficient to support section 12 liability to those investors in attendance. A seller must do more than "merely assist in another's solicitation efforts." *Pinter v. Dahl,* 486 U.S. at 651–52 n. 27, 108 S.Ct. at 2081 n. 27.

The undisputed evidence shows that Esrine had minimal contact with the investors. Only one investor, Marshall Wolper, ever met Esrine before signing the GRI agreements contained in the PPM. Wolper testified that Esrine was one of several persons present at one or more dinner conversations during which Spira, a broker party, discussed with him the merits of the GRI offering. Wolper also testified that at the time he executed the subscription documents, he asked Esrine what he thought about the deal, and Esrine replied that he thought it was a "good deal." Wolper dep., pp. 36–37, 89. Again, we find that Esrine only assisted in Spira's solicitation of Wolper and does not qualify as a seller with respect to Wolper.

Two investors, Dennis Gann and David McDonald, spoke with Esrine over the telephone before purchasing a unit on behalf of Canyon Leasing Company, Inc. Jordan placed the call to Esrine from Gann's office and asked Esrine for advice concerning the financial information Canyon Leasing should include in its application. Gann

dep., pp. 54–56; McDonald dep., pp. 24–27. Two other investors, Larry Stick and H. Lee Leonard, sent certain application documents to Esrine, but never spoke directly to him. Larry Stick dep., pp. 72, 101, 127; Leonard dep., p. 360. The only other investors who met Esrine, William Brothers and Grant Curtis, testified that their meeting with Esrine occurred after they had invested in GRI. Brothers dep., pp 63–65, 71–71; Curtis dep., pp. 100–101. Clearly, Esrine did not solicit purchases from any of these investors.

The investors also cite cases which held that defendants who prepared and disseminated prospectuses qualify as section 12 sellers. *See Capri v. Murphy*, 856 F.2d 473, 478–79 (2d Cir.1988); *In re Professional Fin. Management, Ltd.*, 703 F.Supp. 1388, 1395–96 (D.Minn.1989); *Suppa v. Montano*, [1989 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 94,348, 1989 WL 69883 (W.D.Mo.1989). Viewing the evidence in a light most favorable to the investors, we accept that Esrine reviewed drafts of the PPM and proposed revisions to them. Section 12 liability does not extend to everyone involved in the preparation of a prospectus. *See Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 536–37 (9th Cir.1989) (lawyers and accountants who drafted documents or approved drafting do not qualify as sellers); *Wilson v. Saintine*, 872 F.2d at 1126–27 (law firm that never contacted plaintiff directly does not qualify as seller); *Abell v. Potomac Ins. Co.*, 858 F.2d at 1114–15 (law firm that helped prepare offering statement does not qualify as seller). While Esrine may have been more extensively involved than lawyers and accountants "whose involvement is only the performance of their professional services," there is no evidence of direct contact between Esrine and any of the investors. *Pinter v. Dahl*, 486 U.S. at 651, 108 S.Ct. at 2081. Focusing on "the defendant's relationship with the plaintiff-purchaser" rather than "the defendant's degree of involvement in the securities transaction and its surrounding circumstances," *id.*, we find that Esrine did not solicit purchases of the GRI units. Northwestern's motion for summary judgment on the Second and Third Causes of Action of the Consolidated Complaint is granted.

### Civil RICO

 The Fifth Cause of Action states a claim against Northwestern pursuant to the civil RICO statute, 18 U.S.C.A. § 1961ff (1984 & Supp.1989). In its motion for summary judgment, Northwestern argues that the investors have not satisfied the predicate act requirement since there is no evidence to support the securities laws claims against Northwestern. Since we deny Northwesterns' motion for summary judgment with respect to the securities laws claims, the predicate act requirement is satisfied for the purposes of this motion. We therefore deny Northwestern's motion for summary judgment with respect to the civil RICO claims.

### Pendent State Claims

1. Common Law Fraud

The general elements of a claim for aiding and abetting common law fraud are the same as the elements for a section 10(b) aiding and abetting claim. *See In re GRI*, 659 F.Supp. at 518. For the reasons discussed above in connection with the section 10(b) claim, we deny the motion for summary judgment with respect to the Sixth Cause of Action for common law fraud.

2. Texas Securities Act

 The investors' Eleventh Cause of Action alleges that Northwestern violated Article 581–33 F(2) of the Texas Securities Act by (1) aiding and abetting the alleged fraud; (2) aiding and abetting the sale of securities not registered with the Texas Securities Commission; and (3) aiding and abetting sales of securities where the total selling expenses allegedly exceeded twenty percent of the selling price. Consolidated Complaint, ¶¶ 131–137. Article 581–33 F(2) states: "[a] person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable ... jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer

or issuer." Tex.Rev.Civ.Stat.Ann. § 581–33 (Vernon Supp.1989). As our discussion of the federal securities laws claims indicates, there are genuine issues of disputed fact with respect to Northwestern's knowledge of the fraud and substantial assistance. Therefore, we deny summary judgment with respect to the Eleventh Cause of Action.

### 3. Negligence

 The Fourteenth Cause of Action alleges that Northwestern was negligent in failing to insure that other parties did not engage in fraud, failing "to exercise due diligence in seeing that GRI honored its contractual commitments," and failing to ascertain the "potential benefits and detriments" of the investments offered. Consolidated Complaint ¶ 145. In general, a surety does not owe a duty to disclose material facts to its principal. *See National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 207 (2d Cir.1989) (citing cases). However, unlike the Turturs, the investors here allege contacts with Northwestern's agent which can create such a duty. *See id.*, n. 5. In addition, once a party makes partial disclosures, it has a "duty to disclose whatever additional information is necessary to rectify the misleading statements." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir.1989). Given the disputes as to the role of Esrine and the extent of his authority as Northwestern's agent, a reasonable jury could conclude that Northwestern owed a greater duty than the typical surety to disclose to the investors any information it had concerning the potential "benefits and detriments" of the GRI transaction or the weak financial condition of GRI. Moreover, as we previously decided, Texas insurance law imposes a statutory duty on an insurer to ensure that its agents acting within the state are licensed to do so. *In re Gas Reclamation, Inc. Securities Litigation*, [1987–1988 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,731, 1988 WL 45632 (S.D.N.Y.1988). We therefore deny the motion for summary judgment with respect to the claims for negligence.

### 4. Texas Deceptive Trade Practices Act

 The Fifteenth Cause of Action alleges that Northwestern violated section 17.46(b) of the Texas Deceptive Trade Practices Act ("DTPA"), Tex.Bus. & Comm. Code Ann. § 17.46(b) (Vernon Supp.1987). Northwestern argues that the investors have not satisfied the causation and intent requirements of that statute. For the reasons set forth in our discussion of the securities laws claims, we find disputed fact issues with respect to this claim as well.

 However, we agree with Northwestern that the New York investors cannot assert these claims arising under Texas statutory law. New York, the forum state for the New York investors, follows the interest analysis approach to choice of law problems in tort cases. *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). Here, Northwestern's alleged misconduct occurred in Wisconsin, and the injury to the New York investors occurred were they reside. *See Miller v. Grigoli*, 712 F.Supp. 1087, 1090 (S.D.N.Y.1989) ("In cases involving securities fraud courts in this Circuit have held that an individual plaintiff usually suffers his injury in the state in which he resides.") (citations omitted). Moreover, the analogous New York statute, the New York Consumer Protection From Deceptive Acts and Practices Statute, Gen.Bus.L. §§ 349 to 350–f (McKinney 1988 & Supp. 1990), does not apply to the sale of securities. *See Morris v. Gilbert*, 649 F.Supp. 1491, 1496–97 (E.D.N.Y.1986). Since Texas has no interest in controlling the conduct of a Wisconsin surety with respect to New York investors, the New York investors cannot assert these Texas statutory claims against Northwestern. We grant summary judgment to Northwestern with respect to these Texas statutory claims brought by the New York investors.

### 5. Texas and New York Insurance Statutes

 In their cross-motion for summary judgment, the Breese Investors allege that

Northwestern violated various Texas insurance statutes and seek rescission of their indemnity agreements. The Abish Investors join in those claims and assert additional claims under New York insurance laws. We must first address the choice of law problem. While Northwestern asserts that Texas law should not be applied to even the Texas investors' claims, we believe that Texas has an interest in regulating insurance contracts and indemnification agreements involving Texas domiciliaries. However, Texas insurance law will not generally protect agreements between New York investors, a Wisconsin surety and banks located outside of Texas. The Abish Investors argue that the promissory notes named GRI, a Texas corporation, as the original obligee. However, the insurance claims asserted do not relate to the promissory notes, but to the surety bonds and the indemnification agreements. Since Texas has no interest in the statutory insurance claims brought by New York investors, we apply only the New York insurance laws to the New York investors' claims.

 Finding disputed issues of material fact, we deny summary judgment with respect to the Texas insurance statutory claims. The investors argue that Articles 5.15 and 5.20 of the Texas Insurance Code (Vernon 1981 & Supp.1990) require prior approval of the forms used and the rates charged by insurers. The parties dispute whether Northwestern did apply for permission to sell financial guarantee bonds and was refused permission. Calculation of the amount of the annual premium charged also depends on disputed facts as to the term of the underlying bond. Article 21.07 of the Texas Insurance Code (Vernon 1981 & Supp.1990) prohibits payment of commissions to unlicensed insurance brokers. The parties dispute the extent of Esrine's activities on behalf of Northwestern. Northwestern also claims that GRI, not Northwestern, paid Esrine for his services. The investors claim that the gifts and loans received by Recard, the Northwestern loan officer, constitute illegal rebates under Article 5.20. We find disputed issues as to whether any additional prohibited compensation was received by Recard

in connection with this transaction. Finally, there are disputed facts as to whether Northwestern either knew about or failed to investigate properly Esrine's criminal background in violation of Article 21.21 of the Texas Insurance Code (Vernon 1981 & Supp.1990).

The Abish Investors claim (1) that Northwestern violated section 2324(a) of the Insurance Law of New York (McKinney 1985) by Recard's alleged acceptance of the loan from Esrine and (2) that Esrine acted as an insurance agent in violation of section 2101(a) of the Insurance Law of New York (McKinney 1985 & Supp.1990) because he did not have a New York license. We also deny summary judgment on these claims for the reasons set forth in the previous paragraph.

### Summary

We grant summary judgment to Northwestern on the Second and Third Causes of Action in the Consolidated Complaint alleging liability for a violation of section 12 of the Securities Act of 1933. We also grant summary judgment to Northwestern on the Texas statutory claims brought by the New York investors. We deny summary judgment on all other claims.

Each of the four Banks has moved for partial summary judgment against Northwestern seeking to enforce its rights under the surety bonds. Northwestern, in response to the Banks' demands for payment, has moved for an order enforcing its equitable rights of exoneration and *quia timet* against each individual investor. These motions are currently returnable on April 19, 1990 and April 5, 1990, respectively, but the parties seek adjournment to an unspecified later date. The Court has also reserved decision on Harold Recard's motion to dismiss the counterclaims alleged against him by Robert L. Middleton in *Northwestern National Ins. Co. v. Middleton,* No. 86–7876 (RCB) (C.D.Cal.), or in the alternative for summary judgment. After these pending motions are decided, the Court will schedule a conference with all the parties to this litigation to determine

whether all pretrial matters have been resolved.

SO ORDERED.