David AQUINO, et al., Plaintiffs,

v.

Barry H. TRUPIN, et al., Defendants.

No. 89 Civ. 7645 (RWS).

United States District Court, S.D. New York.

Sept. 22, 1993.

---

4. *See supra* note 2.

O'Donnell, Fox & Gartner, P.C. (William G. O'Donnell, of counsel), New York City, for plaintiffs.

McDonough Marcus Cohn & Tretter, P.C. (Diane K. Kanca, of counsel), New York City, for defendant Stuart Becker & Co.

## *OPINION*

SWEET, District Judge.

Defendants Stuart Becker and Stuart Becker & Co., P.C. (collectively "SBC") have moved to dismiss all claims in the Third Amended Complaint pursuant to Rules 12(b)(6) and 9(b), F.R.Civ.P. For the reasons given below, the motion is granted.

### *The Parties*

The Plaintiffs in this action and in its companion actions, *Morin v. Trupin* and *Alberti v. Trupin,* are investors in limited partnerships organized and offered by Barry Trupin ("Trupin") and companies controlled by him, particularly Rothschild Realty. Familiarity with the underlying disputes and principal parties in these actions is assumed. *See, e.g., Ahmed v. Trupin,* 781 F.Supp. 1017 (S.D.N.Y.1992); *Ahmed v. Trupin,* 809 F.Supp. 1100 (S.D.N.Y.1993); *Morin v. Trupin,* 711 F.Supp. 97 (S.D.N.Y.1989) (filed April 13, 1989); *Morin v. Trupin,* 728 F.Supp. 952 (S.D.N.Y.1989) (filed December 13, 1989); *Morin v. Trupin,* 738 F.Supp. 98 (S.D.N.Y.1990) (filed May 4, 1990); *Morin v. Trupin,* 747 F.Supp. 1051 (S.D.N.Y.1990) (filed September 29, 1990); *Morin v. Trupin,* 778 F.Supp. 711 (S.D.N.Y.1991) (filed November 18, 1991); and *Morin v. Trupin,* 799 F.Supp. 342 (S.D.N.Y.1992) (filed July 28, 1992). The plaintiffs in *Aquino* are represented by different counsel, but the underlying substantive claims are essentially the same as in *Morin* and *Alberti.*

The *Aquino* action, originally filed on November 16, 1989 under the caption *Ahmed v. Trupin,* concerns interests in Sarasota Plaza Associates ("Sarasota Associates"), a limited partnership organized under the laws of New York, and in a series of interlocking real estate partnerships organized under the laws of Florida.

Defendants the Rothschild Group consist of companies and limited partnerships allegedly controlled by Trupin, including Rothschild Registry International, Inc., Rothschild Reserve International, and RRI Realty Corporation. Defendants also alleged to be controlled by Trupin include Tru Management Corp., a Delaware corporation with its principal place of business in Florida and North American Associates ("North American"), a New York limited partnership.

SBC is a New York corporation which served as accountants for the Sarasota Associates and had served as accountants for at least three other Trupin-controlled limited partnership syndications, all offered in 1984 and structured in the same fashion as the partnership syndications at issue here.

### *Prior Proceedings*

The original complaint in *Aquino* was filed November 16, 1989, under the caption *Ahmed v. Trupin.*[1] Certain defendants' motions to dismiss for failure to plead fraud with particularity were granted twice, on January 9, 1992, and January 7, 1993. On March 8, 1993, this Court reinstated plaintiffs whose securities fraud claims had expired due to the retroactive effect of *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), and the Third Amended Complaint was filed.

The plaintiffs have alleged six claims for relief in the Third Amended Complaint: violations of Section 10(b) of the 1934 Securities Exchange Act (15 U.S.C. § 78(j)(b)) against all defendants, the aiding and abetting of such violations against SBC, three counts under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964)(a)–(d)) (RICO), one count of civil theft under Florida law, and a common-law claim for breach of fiduciary duty. SBC has moved again to dismiss the complaint against it for failure to plead the securities fraud claims with particularity.

---

1. Khalid Ahmed's claim was found to be time-barred pursuant to this court's opinion in *Ahmed*

*v. Trupin,* 809 F.Supp. 1100, 1108 (S.D.N.Y. 1993).

All of these allegations are based on the claim that SBC knew that the financial projections and promised tax benefits offered by Sarasota Associates were false because SBC knew that prior tax shelters offered by Trupin had been disallowed by the I.R.S. They have imputed knowledge of these prior audits to SBC by alleging that an employee of SBC, Jeffrey Zukoff ("Zukoff"), had previously been employed by Cornick, Garber & Sandler, accountants for the Rothschild Group, and in the course of his work there had prepared financial statements which had disclosed prior I.R.S. audits of Trupin-organized partnerships. Based on this information, the Plaintiffs have alleged that SBC knew that the tax benefits promised by the limited partnerships were likely not to be realized, and accordingly that the projections of tax losses and future income prepared by SBC were false and misleading.

SBC has moved to dismiss on two grounds: first, that the plaintiffs have not actually alleged that Zukoff was employed by SBC on or before the actual date of the Sarasota offerings, and second, that the Plaintiffs have not pleaded loss causation since the Plaintiff have not alleged that the promised tax benefits were not realized.

### The Facts

On a motion to dismiss, all of the factual allegations in a complaint are accepted as true, and all allegations must be considered in the light most favorable to the movant. *Weiss v. Wittcoff*, 966 F.2d 109, 112 (2d Cir. 1992). The facts below, therefore, are taken from the plaintiffs' complaint and do not represent factual findings by the Court.

Sarasota Associates offered interests in an office building referred to as the "United First Federal Plaza" (the "Property") through private placement memoranda dated September 18, 1984. The general partner in Sarasota Associates was Sarasota Management Corp., ("SMC"), a New York corporation with its principal place of business in New York City.

Three Florida limited partnerships known as Rothschild Realty Partners 118, Rothschild Realty Partners 119, and Rothschild Realty Partners 119M (the "118–119 Investor Partnerships") packaged different interests in commercial real estate among the partnerships, including interests in Sarasota Plaza Associates, which otherwise were structured precisely the same way. Limited partnership interests in the 118–119 Investor Partnerships were offered through three private placement memoranda dated May 10, 1985.

The *Aquino* plaintiffs purchased their interests in the Sarasota Plaza Associates and the 118–119 Investor Partnerships from July 1984 through October, 1985. The Plaintiffs characterize the 118–119 Investor Partnerships as "basically a repackaged version of 60 units in the Sarasota Plaza Associates." Although interests in the 118–119 Investor Partnerships were offered in 1985 and 1986 for $150,000 per unit, and interests in Sarasota Associates were offered in 1984 and 1985 for $97,928.00 per unit, upon subscription investors were required to pay only $6,000 for the Investor Partnership interests and $1,834 for the Sarasota interests in cash. The balance was to be paid pursuant to promissory notes made out by the investors in the limited partnerships.

Sarasota Associates was structured so that debt payments on the two mortgages on the Property were passed directly through the partnerships to each limited partner via a wrap-around mortgage. For each limited partner to achieve the promised tax benefits, the entity holding the wrap-around mortgage had to be perceived as "unaffiliated" by the Internal Revenue Service and the wrap-around mortgage itself had to be treated as the result of arms'-length negotiation.

The Private Placement Memoranda ("PPM") represented that the Property had initially been purchased by SMC for $22,500,-000, that the Property had been sold to an unaffiliated entity, North American, and that it had been sold back to Sarasota Associates subject to a wraparound mortgage for $18,-500,000 (the "First Federal Purchase Money Note"), which had been duly negotiated at arms'-length so that the limited partners could deduct all interest payments. SBC prepared financial forecasts and projections expressly based upon this information which were included in the Sarasota Associates PPM.

The plaintiffs allege that the true purchase price of the Property paid by the first Trupin entity to buy it was $15,200,000, and the fair market value at the time of the offering was at least $7.3 million less than the value set forth in the PPM. The PPM also concealed the affiliated status of North American, which was managed by a friend of and directly controlled by Trupin. A plaintiff who held interests in Sarasota Associates could lawfully deduct only interest payments on the first two mortgages on the Property, not at the higher rate of 18.875% provided for in the wrap-around mortgage.

The plaintiffs have also alleged that Barry Trupin converted Sarasota Associates partnership funds to his own account from June 1985 to December 1986, in the total sum of $3,304,850, and that he wired $1,218,000 from the proceeds of a new mortgage on the Property directly to a personal bank account on December 31, 1986. However, such post-offering acts cannot implicate SBC, which is charged only with aiding and abetting the frauds practiced on the plaintiffs through misleading or omitted statements in the PPM.

Banks holding the original mortgage and the Metro North mortgage instituted foreclosure actions on the Property in June and July of 1988. Sarasota Associates subsequently filed for protection from its creditors under Chapter 11. The plaintiffs allege they had no notice of the material misrepresentations in the PPM until January, 1989, when Sarasota Management Corp. was removed as the general partner of Sarasota Associates and the plaintiffs had access to the books and records of the partnership. The Bankruptcy Court entered a default judgment of $16,967,-555.25 against Rothschild Registry Properties Corp., Rothschild Registry, and Sarasota Management Corp. on March 5, 1991.

### Discussion

#### I. *Standards for a Motion to Dismiss*

The standard of review under Rule 12(b)(6) requires the court to accept as true all reasonable inferences which can be drawn from the Third Amended Complaint. The complaint need only "contain direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory," *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) (citations omitted). A complaint is not to be dismissed unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *accord, Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

In the Second Circuit, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements of documents incorporated in it by reference. *Cortec*, 949 F.2d at 47; *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989); *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985). The court may review documents integral to the complaint even where they have been neither attached nor incorporated by reference. *See Cortec*, 949 F.2d at 47; *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991). Since the complaint hinges upon misrepresentations in the offering PPM, it incorporates them by reference and accordingly they will be relied upon by this court in considering the motion to dismiss.

#### II. *Failure to Plead Fraud with Particularity under Rule 9(b)*

Rule 9(b), F.R.Civ.P., provides that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Rule 9(b) is designed to further three goals: (1) providing a defendant who needs to prepare a defense with fair notice of the plaintiffs' claim; (2) protecting a defendant from harm to his reputation or good will, and (3) reducing the number of strike suits. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). Reference of misrepresentations in offering memoranda satisfies 9(b)'s requirement of identifying the time, place, speaker, and content of the mis-

representation where the defendants are insiders or affiliates participating the offering of the securities. *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd,* 936 F.2d 674 (2d Cir.1991) (citing *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990)).

■ A claim of securities fraud under 10(b) adds the requirement that the cause of action involve the purchase or sale of a security to the elements required for commonlaw fraud: a knowing misrepresentation upon which the plaintiff relied and which was directly responsible for his loss. A complaint alleging securities fraud must allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent, supporting either intent to defraud, knowledge of falsity, or reckless disregard for the truth. *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir.1991). This can be done by alleging facts showing a motive for committing fraud, and a clear opportunity to do so, or by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater. *See Ades v. Deloitte & Touche,* 799 F.Supp. 1493, 1498 (S.D.N.Y. 1992).

The plaintiffs have alleged two facts which they claim support an inference of scienter: SBC's receipt of sales commissions and SBC's employment of Zukoff. Neither fact raises an inference of fraud on the part of SBC.

Allegations about the commissions do not support an inference of fraud because, as pled by the plaintiffs, they support inferences neither of scienter nor loss causation. The sections of the complaint which concern the commissions state in their entirety:

> Upon information and belief, Becker and his affiliates, as testified to by Gnesin, received commissions for selling interests in Rothschild Group limited partnerships to Becker's clients.

> Upon information and belief, the receipt of commissions rendered the firm of Stuart Becker & Co. not "independent" under accounting rules and therefore incapable of rendering the 1985 audit opinion. As a result, the 1985 audit was conducted in a manner which contravened generally accepted accounting principles.

Complaint ¶¶ 60, 62.

■ Since the plaintiffs have alleged fraud only in the projections, not in the 1985 audit, the second allegation must be dismissed for failing to state a claim; since the Plaintiffs apparently purchased their interests before the 1985 audit was available, they could not possibly have relied upon it. The first allegation must be dismissed as well for failing to allege a motive for fraud. There are no allegations that these commissions were out of the ordinary, or that SBC had failed to disclose to its clients that it was the auditor of the partnerships, or even that these commissions were concealed from the limited partners. The receipt of ordinary fees for professional services does not, by itself, support a motive for fraud. *See In re Crazy Eddie Sec. Litig.,* 812 F.Supp. 338, 348 (E.D.N.Y.1993); *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1242 (S.D.N.Y.1992). In any event, the Plaintiffs' loss did not stem from the receipt of selling commissions from the partnership, but, according to the Third Amended Complaint, could have stemmed only from fraudulent statements which induced the plaintiffs to purchase their interests. *See Adler v. Berg Harmon Assocs.,* 816 F.Supp. 919, 926 (S.D.N.Y.1993) (dismissing allegations of concealed commissions because of failure to allege loss causation, based on fact that no secondary market existed for unregistered securities).

■ Secondly, the Plaintiffs impute knowledge of the Rothschild group's tax problems to SBC based on SBC's employment of Zukoff at the time. They allege that since SBC knew the Rothschild Group's negative audit history, preparing the forecasts without mentioning this demonstrates conscious behavior. However, they simply allege that "on information and belief," Zukoff was employed "at the time" of another limited partnership real estate syndication (the "Sacramento offering"). The Sacramento projections and offering memoranda were completed by October 15, 1984, close to a month after the projections and offering memoranda for the

Sarasota limited partnership were completed, on September 18, 1984. Certain of the Defendants deposed the Plaintiffs' witness, Frederick Gnesin ("Gnesin") on April 22 and 23, 1993. At the deposition, he testified that although he had previously believed that Zukoff worked at SBC during the time in which the Sacramento projections were prepared, he had since learned that Zukoff may not have been employed by SBC until well after the dates of the Sacramento offering.

In short, the Plaintiffs have at most alleged that Zukoff worked for SBC a month after the date of the allegedly misleading offerings. They have not alleged that Zukoff was actually employed at SBC when the projections for the Sarasota limited partnership were being prepared. Although all facts alleged by a plaintiff in a complaint must be taken as true, *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676–77 (2d Cir.1991); *Cosmas*, 886 F.2d at 11, and pleadings upon information and belief are acceptable as to matters peculiarly within the opposing party's knowledge and control, *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986), the complaint still fails to raise an inference of scienter on the part of SBC.

### III. *Loss Causation*

Even if the plaintiffs could plead SBC's knowledge of the Rothschild Group's tax problems with more particularity, the Third Amended Complaint would still fail for lack of pleading of loss causation. The plaintiffs have simply alleged that they "have been damaged to the extent of their entire investment in the Investor Partnerships, including all sums paid in respect of their Investor Notes," Complaint ¶ 67. Nowhere do they allege that the tax benefits promised in the PPM have been disallowed by the I.R.S.

■ A claim for fraud under the securities laws requires both transaction causation (i.e. but-for causation: but· for the defendants' fraud, the plaintiffs would not have purchased or sold the securities) and loss causation. Loss causation "turns upon a question of proximate cause: was the damage complained of a foreseeable result of the plaintiff's reliance on the fraudulent misrepresentation?" *Weiss*, 966 F.2d at 111; *Manufacturers Hanover Trust Co. v. Drysdale Sec.*

*Corp.*, 801 F.2d 13, 21 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). There must be a direct or proximate relationship between the loss and the misrepresentation, *Bennett v. United States Trust Co.*, 770 F.2d 308, 314 (2d Cir. 1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). Although it is not necessary to plead causation in any great detail, *Whitbread (US) Holdings, Inc. v. Baron Philippe de Rothschild, S.A.*, 630 F.Supp. 972, 979 (S.D.N.Y.1986), the plaintiffs must show that SBC's misrepresentations about the likely tax status of the Sarasota units go to the investment quality of the limited partnership shares. *Manufacturers Hanover*, 801 F.2d at 22. "[P]laintiffs must prove that but for the circumstances the fraud concealed, the investment would not have lost its value." *In re Gas Reclamation, Inc. Sec. Litig.*, 733 F.Supp. 713, 721 (S.D.N.Y.1990).

The plaintiffs have completely failed to show how they were damaged by the defendants' alleged fraud, a showing required by Rule 9(b). *See Quintel Corp., N.V. v. Citibank, N.A.*, 589 F.Supp. 1235, 1242 (S.D.N.Y. 1984). Sarasota Associates was primarily a tax shelter. Upon a motion such as this, the court may consider the PPM for the Sarasota offering even though the Plaintiffs have not attached it to their Third Amended Complaint, for the Complaint clearly incorporates the PPM by reference. *Cortec*, 949 F.2d at 47; *I. Meyer Pincus*, 936 F.2d at 762. As the PPM for the Sarasota Plaza Associates reveals, the purpose of the investment was to generate tax losses, which would be "passed through" to the limited partners to deduct on their tax returns. According to the financial projections prepared by SBC, the Property was scheduled to be in the red at least until 1998. The Plaintiffs have never alleged that these tax benefits were denied by the I.R.S., unrealized by the plaintiffs, or unavailable for any other reason.

■ When plaintiffs have invested solely to acquire losses to report on their tax returns, the misstatements or omissions upon which a claim of fraud is predicated must be materially related to the purported tax-related benefits of the investment. *See, Sable v.*

*Southmark/Envicon Capital Corp.*, 819 F.Supp. 324, 335 (S.D.N.Y.1993) ("Purchase price, interest rates, and profits to affiliates are of little material interest to a party whose goal is to maximize tax losses in exchange for a limited partnership investment."). This case is governed by *Sable* precisely because the "conscious behavior" alleged on the part of SBC relates to the accountants' knowledge of the likely tax benefits.

■ In *Sable,* this Court dismissed allegations of fraud against attorneys who had supplied tax opinion letters in a real estate limited partnership offering that had been marketed primarily on the basis of the tax benefits it offered. *Id.* at 329. The court held that the letters did not represent independent assessments of the fair market value of the properties for non-tax purposes, and the complaint did not allege that the I.R.S. had disallowed the anticipated tax deductions or otherwise taken action as a result of the tax opinion letters. *Id.* at 335.

The financial projections in the present case also do not represent an independent valuation by SBC. The letter from the accountants in the offering materials state merely that the projections were prepared in conformity with standards set by the American Institute of Certified Public Accountants ("AICPA") for projections, which do not require the independent investigations necessary for audits:

> This report, financial and tax projections, is based solely upon estimates, assumptions and projections provided by the General Partner of Sarasota Plaza Associates.... The significant notes and assumptions used were furnished to us by the General Partner of Sarasota Plaza Associates and are described in the accompanying Notes and Assumptions. Only data and material made available to us as of September 18, 1984 has been used in applying the above described review procedures. No other verification procedures were applied.

SBC Reply Mem. of Law, Exh. A. To the extent the projections were based upon the purported tax benefits, they were as accurate as the opinion letter in *Sable.* SBC simply constructed projections based upon information supplied to them, including tax information.

The tax information has not been shown to be false, and the Plaintiffs have alleged no facts to show SBC knew the other information supplied to them was false. At most, the plaintiffs suggest that SBC failed to exercise due diligence when it accepted the General Partner's representations. But this claim, even if supported by facts, would not rise above the level of negligence. Nothing here supports a "strong inference" of knowledge of fraud on the part of SBC. *Cosmas,* 886 F.2d at 12–13; *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987).

In *Sable,* the plaintiffs conceded that they purchased interests to generate tax losses, and the offering materials apparently never promised future income. In the case at bar, the Sarasota Plaza Associates did, admittedly, anticipate a net profit around the year 2000. However, that is far enough into the future to make it evident that the primary purpose of this investment was tax losses. Under the circumstances, this Court need not decide how far in the future such projected returns must be in order for an investment to be primarily a tax shelter. It is enough that in this case the goal of the limited partners was tax losses, and the plaintiffs have not alleged that their losses have been disallowed by the I.R.S.

### IV. *Aiding and Abetting Liability*

■ To state a claim for aiding and abetting a securities law violation, the plaintiff must show the existence of a violation by the primary party, knowledge of this violation on the part of the aider and abettor, and substantial assistance by the aider and abettor in the violation. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985); *IIT v. Cornfield,* 619 F.2d 909, 922 (2d Cir.1980). An aiding and abetting claim must also satisfy the particularity requirements of Rule 9(b), *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 260 (S.D.N.Y.1989).

■ Since the plaintiffs have alleged no facts which raise an inference that SBC knew of any underlying securities fraud, the plaintiff's claim for aiding and abetting must fail. "Liability cannot be imposed absent a show-

ing at least that the defendant had actual knowledge of the tortious conduct by the primary wrongdoer, particularly where the alleged aider and abettor owes no fiduciary duty," to the injured party. *IIT*, 619 F.2d at 925; *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.* 676 F.Supp. 458, 463 (S.D.N.Y.1987). The theory of loss here is that SBC's projections aided the primary defendants to make false promises of unrealizable tax losses. Loss causation, however, is as necessary for a theory of aiding and abetting liability as it is for a primary violation, *see In re Gas Reclamation*, 733 F.Supp. at 721; in the absence of allegations that the I.R.S. has disallowed tax losses stemming from the Sarasota partnership, the aiding and abetting counts must fail as well.

*Conclusion*

For the foregoing reasons, the motion to dismiss for failure to plead fraud with particularity is granted.

It is so ordered.